Robert G. FOWLER

v.

McCRORY CORPORATION.

Civ. No. JFM–87–1610.

United States District Court,
D. Maryland.

Dec. 22, 1989.

Keery Scanlon, Washington, D.C., Gary Simpson, Bethesda, Md., J. LeVonne Chambers, New York City, and Daniel B. Edelman, Washington, D.C., for plaintiff.

Eli Gottesdiener, Patton, Boggs and Blow, Washington, D.C., and Jeffrey Mann, Rubin, Baum, Levin, Constant and Freidman, New York City, for defendant.

## OPINION

MOTZ, District Judge.

Plaintiff, Robert G. Fowler, alleges that he was constructively discharged by defendant, McCrory Corporation, as a consequence of his refusal to implement a racially discriminatory hiring policy. He has filed a second amended complaint containing three counts. The first count asserts a claim under 42 U.S.C. § 1981 (1982), the second count a claim under section 27–20(a) of the Montgomery County Code, Montgomery County, Md., Code § 27–20(a) (1984), and the third count a claim under Title VII, 42 U.S.C. §§ 2000e–2000e–17 (1982). I have previously certified to the Maryland Court of Appeals the question of whether Fowler has a cognizable claim under section 27–20(a) of the Montgomery County Code, and the Court of Appeals presently has that question *sub curia.* McCrory has now, in the wake of the Supreme Court's decision in *Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), moved to dismiss the claim under § 1981.

## I.

The facts as alleged by Fowler, which for the purpose of McCrory's motion to dismiss must be assumed to be true, are as follows:

On March 27, 1985 Fowler was performing his job as store manager at McCrory's Silver Spring store. He had been manager of the store since 1978. On that day, Ms. Mitchell, a restaurant zone manager for McCrory, conducted an inspection of the Silver Spring restaurant and told Fowler that he had hired too many blacks for the restaurant. She said that Mr. Dovenmuehl, a regional manager, Mr. Remnick, a company manager, and Mitchell herself had repeatedly told Fowler "not to hire all blacks for the restaurant." She went on to say that Mr. Dovenmuehl had told a Norfolk restaurant manager that he would be fired if he did not hire the "kind of people" he had been told to hire.

In response, Fowler sent a "witness statement" to Don Harvey, a McCrory vice president, providing the details of the incident and protesting the discriminatory hiring instructions. Three other McCrory employees, who had overheard Ms. Mitchell make some or all of these comments, submitted witness statements to Harvey as well.

Fowler never received a written response to his witness statement. However, he was asked to and did meet with a regional personnel manager, Al Winsheimer, in April 1985. Fowler requested a letter from McCrory stating that the company would not discriminate on the basis of race. McCrory never sent Fowler the requested letter and took no other action to repudiate the discriminatory instructions. Thereafter McCrory employees allegedly harassed and retaliated against Fowler for protesting the discriminatory hiring policies. For example, on November 30, 1985, McCrory's president, Phil Lux, visited the Silver Spring store and told Fowler that "there is no place for you in the future of this store."

On December 13, 1985, Fowler and Ms. Godbold (one of the employees who had previously submitted a witness statement) phoned in their complaints about McCrory

to the Montgomery County Human Relations Commission. The same morning, after telephoning the Commission, Fowler phoned various managers of McCrory informing them that a complaint had been filed. Within an hour, William Tallman, another McCrory vice president, called Fowler, asked him if he and Ms. Godbold had yet to sign the Commission complaint, and informed him that they had until 2:30 p.m. that day to reconsider their action. When Fowler later informed Tallman that he had not decided to withdraw the complaint, Tallman suspended him without giving any specific reason for the suspension.

An additional incident occurred on December 17, 1985, when a district manager of McCrory, in Fowler's presence, referred to a Thai employee as "like a black person, slow and always trying to get out of doing work." Fowler requested that such comments not be made around him. On January 21, 1986, Fowler informed McCrory that he was forced to resign because of the company's actions. He left his job on February 28, 1986, after over 30 years of employment.

## II.

42 U.S.C. § 1981 provides in pertinent part as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens. . . .

In *Patterson v. McLean Credit Union,* 109 S.Ct. at 2369, the Court declined to overrule *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), which held that § 1981 applies to private conduct. The Court reaffirmed that claims for racial discrimination in hiring and promotion are cognizable under § 1981. 109 S.Ct. at 2377. Recognizing, however, that an expansive reading of § 1981 would engulf Title VII and undermine the integrity of the dispute-resolution mechanism established therein, the Court refused to extend § 1981 to a claim for post-contract, on-the-job racial harassment. *Id.* at 2373–75. Although some questions concerning the scope of § 1981 remain after *Patterson,* the fundamental import of the decision is clear: where there is an overlap between § 1981 and Title VII (or another federal statute comprehensively addressing matters of racial discrimination), only those claims which clearly fall with the parameters of § 1981 may be asserted under that section.[1]

Due regard for the *Patterson* decision thus requires that courts exercise restraint in construing the terms of § 1981. This does not mean, however, that only a person who has been refused a job or denied a promotion has a cognizable § 1981 claim. Here, proper analysis requires the conclusion that Fowler has a claim under § 1981 both as a person whose right to "give evidence" has been violated and as a person who has been concretely injured by a discriminatory hiring policy directly violative of § 1981.

**1.** One of the questions which *Patterson* leaves somewhat unclear concerns the nature of the promotion claims which are covered by § 1981. The Court indicated that "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981." *Patterson,* 109 S.Ct. at 2377. In support of that proposition, the Court cited only *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), which involved the dramatic change in status from associate to partner in a law firm. Presumably, however, any promotion which would involve a concrete change in the terms of employment (such as salary or benefits) would be covered by § 1981.

A second question which *Patterson* does not resolve is whether claims for discharges are in and of themselves covered by § 1981. Most courts which have considered this issue after *Patterson* have held that such claims are not covered. *See, e.g., Overby v. Chevron USA, Inc.,* 884 F.2d 470 (9th Cir.1989); *Leong v. Hilton Hotels Corp.,* 51 E.P.D. paragraph 39,257, 1989 WL 116880 (D.Haw. July 26, 1989); *but see Padilla v. United Air Lines,* 716 F.Supp. 485 (D.Colo.1989). The former cases seem to be correctly decided since the termination of employment does not in and of itself constitute the violation of a right enumerated in § 1981.

## A. Violation of the Right to "Give Evidence"

By its terms § 1981 protects the exercise of four different rights or sets of rights: (1) the right to "make contracts"; (2) the right to "enforce contracts"; (3) the related rights "to sue, be parties, give evidence"; and (4) the right to "the full and equal benefit of all laws and proceedings for the security of persons and property."

 In *Patterson* the Court appears to have considered only two of these rights: the right to "make contracts" and the right to "enforce contracts." 109 S.Ct. at 2372. McCrory argues that the Court subsumed the third set of rights—"to sue, be parties, give evidence"—within the concept of the right to "enforce contracts."[2] McCrory points out that the *Patterson* Court stated that the latter right "embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims within regard to race." *Id.* at 2373. That much is certainly true. However, the fact that there is a degree of concentricity between what is implicitly protected by the right to "enforce contracts" clause and the express language of the rights "to sue, be parties, give evidence" provision does not mean that the two displace one another. There are certain acts, such as the racially motivated refusal of a labor union to process grievances under a collective bargaining agreement, which constitute a violation of a person's right to enforce his contract but which would not implicate his right to sue, be a party or give evidence. *Id.* (citing *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)). By the same token a person who has been retaliated against for reporting to a public agency an alleged racially discriminatory hiring policy has suffered a violation of his right to "give evidence" even though it is not his own contract right which he is seeking to enforce.[3]

This is not to say that every employee who alleges that he was retaliated against for filing or pursuing a claim of racial discrimination has a cognizable claim under § 1981. If, for example, he filed his claim with the EEOC, the instruction of the Court in *Patterson* that § 1981 and Title VII should be construed so that they are reasonably consonant with one another suggests that the remedy provided by Title VII itself for retaliation would be exclusive. Furthermore, if it could be proved that the employee deliberately chose to file a complaint with an agency other than the EEOC in order to create for himself a § 1981 claim for retaliation, concern for the

---

**2.** Candor perhaps requires that I acknowledge that I find enigmatic one aspect of the Court's discussion of the right to "enforce contracts." The Court concludes the paragraph in which that right is most fully discussed with a favorable quotation from a sentence in Justice White's dissenting opinion in *Runyon*, stating that all of the rights enumerated in § 1981, other than the right to "make contracts," refer only to the removal of *legal disabilities. Patterson*, 109 S.Ct. 2373 (quoting *Runyon*, 427 U.S. at 195 n. 5, 96 S.Ct. at 2606 n. 5. (White, J., dissenting)). If that were true, it would appear that a person who was blocked by a mob at the courthouse steps to prevent him from asserting a claim arising out of anything other than the right to make a contract would not have a claim under § 1981. That conclusion seems somewhat dubious. In any event, the language quoted by the Court seems inconsistent with its own statement that § 1981 "also covers wholly *private* efforts to impede access to the Courts or obstruct non-judicial methods of adjudicating disputes about the force of binding obligations, as well as discrimination by private entities, such as labor unions, in enforcing the terms of the contract." *Patterson*, 109 S.Ct. at 2373 (emphasis in original).

**3.** Fowler does argue that his right to enforce his own contract was violated by McCrory's action. He contends that all applicable laws are incorporated into a contract and that therefore his contract rights were violated when McCrory violated federal, state and county anti-discrimination laws in retaliating against him. This argument proves far too much. If it were accepted, every act of unlawful discrimination would constitute a breach of contract and would, in contradiction to the holding in *Patterson*, be actionable under § 1981. Thus, whatever value the principle upon which Fowler relies may have in certain contexts, *see, e.g., Denice v. Spotswood I. Quinby, Inc.*, 248 Md. 428, 237 A.2d 4 (1968) (incorporating the provisions of a county building code into a construction contract), it constitutes too broad a statement to enhance the analysis of a § 1981 claim. *See generally* 4 S. Williston & W. Jaeger, *A Treatise on the Law of Contracts* § 615, at 605–06 (3d ed. 1961).

integrity of the Title VII scheme might well require rejection of his claim. Here, however, no such issue is presented. According to his allegations, Fowler was retaliated against by McCrory for filing a complaint with the Montgomery Human Relations Commission, and there is no indication that he chose to file his complaint with that agency to obtain tactical advantage in this litigation.

### B. *Third–Party Standing*

Fowler also has a viable claim under § 1981 as a person who suffered concrete injury as a result of McCrory's refusal to "make contracts" on a non-discriminatory basis.

■ That Fowler has "standing" in the constitutional sense cannot be questioned. He has alleged that he has suffered particularized injury—loss of his employment—which is directly traceable to McCrory's illegal conduct. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1969) (citations omitted). The more difficult question is whether he should be deemed to have the right to bring an action under § 1981 despite the fact that it was not his own right to "make contracts" with which McCrory interfered.[4] Whether this question be framed in terms of prudential limitations upon a party's standing, the implication of a cause of action in his favor, or the conferral of statutory standing upon him, the inquiry is the same. *See Westray v. Porthole, Inc.,* 586 F.Supp. 834, 836 (D.Md.1984) (citing Currie, *Misunderstanding Standing,* 1981 Sup.Ct. Rev. 41, 43); *see generally Sullivan v. Little Hunting Park,* 396 U.S. 229, 90 S.Ct.

400, 24 L.Ed.2d 386 (1969); *Des Vergnes v. Seekonk Water District,* 601 F.2d 9 (1st Cir.1979).[5]

Courts have made this inquiry in a variety of contexts. For example, in *Sullivan v. Little Hunting Park,* the Supreme Court held that a white man who had been expelled from membership in a community park association for having transferred an interest in the association to a black had standing to sue the association because he had been "punished for trying to vindicate the rights of minorities protected by § 1982." 396 U.S. at 237, 90 S.Ct. at 404. Likewise, numerous courts have held that developers undertaking to construct low income apartment complexes have standing to sue under §§ 1981, 1982 and 1983 where they allege that they have been denied building permits or zoning approval in order to prevent minorities from moving into the area. *See, e.g., Des Vergnes,* 601 F.2d 9; *Scott v. Greenville County,* 716 F.2d 1409 (4th Cir.1983); *In re Malone,* 592 F.Supp. 1135 (E.D.Mo.1984), *aff'd sub nom. Malone v. City of Fenton,* 794 F.2d 680 (8th Cir.1986); *Gordon v. City of Cartersville, Georgia,* 522 F.Supp. 753 (N.D.Ga. 1981). On the other hand, courts have held that an insurance agent does not have standing to challenge the practice of "redlining," i.e., arbitrarily refusing to underwrite the risks of persons residing in predominately black neighborhoods. *Mackey v. Nationwide Ins. Companies,* 724 F.2d 419 (4th Cir.1984). Similarly, whites have been held not to have standing under § 1981 to challenge a bar's alleged practice of not serving black customers under the theory that their rights of association had

---

**4.** Fowler does make an ancillary argument that McCrory's discriminatory hiring policy prevented him, as the manager of a McCrory's store, from entering into contracts with blacks. This contention is unpersuasive since "the law is well-settled ... that an agent making a contract for a disclosed principle does not become a party to that contract." *Gonzalez v. The Home Insurance Co.,* No. 85 Civ. 5856 (JMC), 1989 WL 106467 (S.D.N.Y. July 28, 1989) (LEXIS, Genfed Library, Dist. file).

**5.** The term "non-minority standing" which is sometimes used in making this inquiry, *see, e.g., Gordon v. City of Cartersville, Georgia,* 522

F.Supp. 753, 757 (N.D.Ga.1981), may be confusing. The issue to which the inquiry is directed is whether a third party may bring an action for an injury which he has suffered as the consequence of the immediate violation of the statutory rights of another. The third party may be a "minority" or a "non-minority," and, since § 1981 protects the rights of whites as well as blacks, *McDonald v. Santa Fe Transportation Co.,* 427 U.S. 273, 287, 96 S.Ct. 2574, 2582, 49 L.Ed.2d 493 (1976), the person whose rights are immediately violated may himself be a "minority" or a "non-minority."

been violated. *Westray,* 586 F.Supp. at 836.

■ The courts have, expressly or implicitly, looked to two factors (in addition to the constitutional requirement of an injury-in fact traceable to the defendant's alleged unlawful conduct) in determining whether a plaintiff has statutory standing: the concreteness of the claimed injury and the degree to which the policies underlying the statute allegedly violated by the defendant can be vindicated by granting the third-party standing. Thus, in *Sullivan* the Court was persuaded that the plaintiff was the only person who would be an effective advocate to challenge the park association's discriminatory policy. 396 U.S. at 237, 90 S.Ct. at 404. The plaintiffs in the developer cases both (1) had suffered concrete injury themselves in that they could not go forward with their projects, and (2) were in the best position to challenge the alleged discrimination in the zoning and building permit process. *E.g., Des Vergnes,* 601 F.2d at 13–14. On the other hand, the Court found in *Mackey* that although the plaintiff may have suffered cognizable injury in the reduction of the commission income which he would have earned but for the defendant's practice of "redlining," there were numerous other persons, i.e. homeowners who suffered direct monetary loss in the form of higher premiums, who could attack the practice. 724 F.2d at 421–22. And in *Westray* both factors argued in favor of denying standing to the white plaintiffs: their claim of injury, while perhaps real, was intangible and the blacks who allegedly were denied admission to the bar could (and, in fact, had) asserted their own claims of discrimination. 586 F.Supp. at 837–38.

In the present case, both of the factors strongly support conferring standing upon Fowler. His injury could not have been more concrete: he lost his job. Moreover, only a person like him who was responsible for hiring store employees was realistically in a position to challenge McCrory's dis-

criminatory policy. Although in theory persons who sought employment and were denied it could assert a § 1981 claim, it may be reasonably assumed that applicants for the position of clerk in a McCrory's store are relatively unsophisticated and unable to advocate effectively the policies underlying § 1981.[6] Counsel for McCrory has suggested that Fowler could have told a minority applicant of McCrory's discriminatory policy and encouraged him to file a complaint with the EEOC. However, it would be strange indeed if the law were to require such an act of disloyalty rather than to encourage a forthright intra-corporate challenge as Fowler made. The interest of effective enforcement of the anti-discrimination laws and the interest in the sound management of private enterprises are both better served by an employer's self-corrective actions than by regulatory overview of employment decisions by a government bureaucracy of limited resources.

### III.

In conclusion, lest perspective be lost in the process of close textual analysis, it may be worthwhile to reiterate what it is that Fowler alleges. He asserts that McCrory maintained a racially discriminatory hiring policy, which was directly violative of § 1981 both before and after *Patterson.* He avers that he complained to his superiors about that policy and that, only after being rebuffed in his attempts to change the policy, did he file a complaint with the Montgomery County Human Relations Commission. Immediately after filing the complaint, he was strongly advised by a McCrory vice president to withdraw it. After he refused to do so, his conditions of employment became intolerable, and he was forced to resign after thirty years of employment with McCrory.

It may well be that before *Patterson* some litigants were using § 1981 promiscuously. Until the Court spoke last term, the

---

**6.** It might also be noted that one of Fowler's allegations is that McCrory hired for positions in his store from another geographical area where more whites lived. If that allegation is true, persons adversely affected by McCrory's alleged policy and practice would not even have known of the employment opportunities which they were being denied.

troubling question always existed why, if § 1981 was as broad in its coverage as some were contending, Congress carefully and deliberately structured the dispute-resolution process as it did when enacting Title VII. There may now be instances where plaintiffs seek to circumvent *Patterson's* holding and repudiate its approach by artful pleading and manipulative interpretation of the Court's language. This, however, is not such a case. Fowler alleges that he was wronged by misconduct, the deterrence of which lies at the very core of the civil rights laws, and his claim is fully cognizable under § 1981.

A separate order denying McCrory's motion to dismiss is being entered herewith.

### ORDER

For the reasons stated in the opinion entered herein, it is this 22nd day of December 1989

ORDERED that defendant's motion to dismiss Count I is denied.