**Kenneth G. HICKS,**
**Appellee/cross-appellant,**

v.

**BROWN GROUP, INC., d/b/a Brown**
**Shoe Company, Inc.,**
**Appellant/cross-appellee.**

Nos. 88–2769, 88–2817.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1989.

Decided April 16, 1990.

Rehearing and Rehearing En Banc
Denied June 4, 1990.

---

432, 434, 79 L.Ed. 912 (1934) (striking down an attempt by Congress to abrogate the gold clause

in government bond obligations).

Thomas M. Hanna, St. Louis, Mo., for appellant/cross-appellee.

Michael J. Hoare, St. Louis, Mo., for appellee/cross-appellant.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and FAGG, Circuit Judge.

McMILLIAN, Circuit Judge.

Brown Group, Inc., d/b/a Brown Shoe Company, Inc. (Brown Group), appeals from a final judgment entered by the United States District Court[1] for the Eastern District of Missouri upon a jury verdict finding that it violated 42 U.S.C. § 1981 (1982) (Section 1981), by discharging Kenneth G. Hicks (Hicks) on the basis of his race. The jury found that Hicks was entitled to no actual damages, but awarded him $10,000 in punitive damages on the ground that Brown Group's action was willful. The district court modified the actual damages to $1.00 and awarded Hicks attorneys' fees and costs. On appeal, Brown Group raises four major issues for reversal: (1) the judgment cannot stand because discriminatory discharge is not cognizable under Section 1981; (2) the district court erred in denying its motion for a judgment notwithstanding the verdict (JNOV) because the jury's finding of discrimination was clearly erroneous and not supported by sufficient evidence; (3) the district court erred in submitting jury instructions and special interrogatories which permitted the jury to find a Section 1981 violation without proof of intentional discrimination; and (4) the district court erred in denying its motion for a JNOV on the punitive damages award. Brown Group also claims that the punitive damage award was not supported by sufficient evidence. On cross-appeal, Hicks alleges that the district court erred in denying his post-trial motion for reinstatement and related equitable relief after he had successfully proven that he would not have been discharged except for his race. For the reasons discussed below, we affirm the judgment of the district court.

1. The Honorable David D. Noce, United States Magistrate for the Eastern District of Missouri, to whom the matter was referred for trial and entry of judgment by consent of the parties pursuant to 28 U.S.C. § 636(c) (1982 & Supp. V 1987).

2. Brown Group is well known for its production of the "Buster Brown" line of children's shoes.

3. The Benton terminal is designed to increase efficiency and facilitate distribution. Drivers transport raw materials from the Benton termi-

## I. Facts

Brown Group is a New York corporation engaged in the business of manufacturing and selling shoes.[2] In the early 1970s, Brown Group owned and operated approximately 35 manufacturing plants located in Missouri, Illinois, Tennessee, Kentucky and Arkansas. Until the early 1980s, Brown Group's warehouse facilities and raw materials terminals were located in St. Louis. Because of declining sales caused by foreign competition, Brown Group was forced to gradually close ten of its northernmost factories by 1982.

In 1982, Brown Group relocated its raw materials terminal from St. Louis to Benton, Missouri (Benton terminal) in order to better service its southern factories.[3] Because of delivery delays and operational problems at the Benton terminal, Brown Group decided to hire CMR Parcel Service, an outside trucking company, to presort raw materials and take over some of the delivery routes. As a result, the amount of work at the Benton terminal decreased significantly. Brown Group decided that the loss of work required a reduction of force at the Benton terminal. Neil Page, Brown Group's assistant director of distribution, directed Rich Williams, the Benton terminal superintendent, to decrease the number of hourly union employees by five, from 17 to 12, and reduce the supervisory staff by one, from three to two. Page gave Williams no guidelines concerning who should be terminated or what factors should be considered in making the decision. This action arises from Brown Group's decision to terminate Hicks, a 51-year-old white male supervisor, and retain Alvin Chester, a 36-year-old black male supervisor.[4]

nal to Brown Group factories, and transport finished goods from the factories back to Benton. Finished goods are not warehoused at the Benton terminal.

4. The third supervisor was Robert Carbrey, a white male approximately 55 years of age. Carbrey was the assistant terminal superintendent at Benton and had more responsibility than Hicks and Chester. He was not a candidate for discharge. Hicks does not challenge the retention of Carbrey.

Hicks started working for Brown Group in February 1948 as a 16–year–old. He worked for Brown Group for 34 years, until he was discharged at age 51 in 1982. Hicks began working as an order clerk in the finished goods warehouse, and held that position for 25 years. On December 4, 1972, Hicks was promoted to a foreman position at the Gustine Avenue warehouse in St. Louis. While at Gustine Avenue, Hicks supervised every department in the warehouse, overseeing the filling and packing of finished good orders. Between late 1977 and May 1980, Hicks held the evening utility foreman position at the Gustine Avenue warehouse, where he filled in for 15 to 20 other foremen who were absent from work because of illness, vacation, or personal reasons. During this period, Hicks obtained experience supervising the manufacturing or raw materials dock. In May 1980, the Gustine Avenue warehouse closed, and the raw materials dock was moved to the Chouteau Avenue warehouse in St. Louis.

In June 1980 Hicks was assigned to supervise the evening shift on the raw materials dock at the Chouteau Avenue warehouse. When Hicks began working this new position, he was briefly trained by Alvin Chester, who held the evening supervisor position at the Chouteau Avenue warehouse prior to Hicks' arrival.[5] After Hicks was trained, Chester was assigned to supervise the day shift. When the Chouteau Avenue warehouse closed, Hicks was assigned to supervise the evening shift at the Benton terminal. Chester, who began working at the Benton terminal about a

month and a half before Hicks,[6] briefly trained Hicks and again transferred to the day shift when Hicks took over the evening shift.[7]

In July 1968 Chester began working on the raw materials dock as an hourly union employee at Brown Group's Gravois Avenue manufacturing plant in St. Louis. He was promoted to dock foreman in January 1973,[8] where he supervised four or five employees. When the Gravois Avenue plant closed in 1975, Chester was transferred to the Gustine Avenue warehouse, where he supervised between eight and ten employees on the raw materials dock. When the Gustine Avenue warehouse closed in 1980, Chester was assigned to the Chouteau Avenue warehouse, where he supervised operations on the raw materials dock until the facility closed in April 1982. Chester was transferred to the Benton terminal in April 1982.[9]

Rich Williams, the Benton terminal superintendent, made the decision to terminate Hicks and retain Chester. At the time he was terminated, Hicks had worked for Brown Group for more than 34 years, the last nine and a half years as a supervisor. At the time Chester was retained, he had 14 years service for Brown Group, and about the same supervisory experience as Hicks.[10] Williams testified that he decided to retain Chester because Chester was better qualified to supervise the raw material operation at the Benton terminal. Hicks claimed that Chester was retained because he was black, and that he (Hicks) was terminated in violation of a company policy

**5.** The parties dispute how long Chester trained Hicks at Chouteau. Hicks testified that Chester familiarized him with the truck schedules and procedures for about eight hours over a two night period. Chester testified that he trained Hicks for two to three weeks.

**6.** Chester did not begin working at the Benton terminal until May 17, 1982, because he obtained company approval to undergo a needed hernia operation before transferring to Benton.

**7.** The parties also dispute how long Chester trained Hicks at the Benton terminal. Hicks testified that Chester worked with him for two or three days, whereas Chester testified that he trained Hicks over a two week period.

**8.** Although Brown Group claims that Chester has been a full-fledged supervisor since January 1973, Chester's performance evaluations listed his position as "Assistant Supervisor" as recently as September 1978.

**9.** Chester was promoted to the position of terminal superintendent at Benton in 1985.

**10.** Hicks had been a supervisor about one month longer than Chester. Hicks was promoted to supervisor in December 1972, followed by Chester in January 1973.

**634**

to make employment decisions based on seniority.

Williams notified his supervisor, Neil Page, that he had decided to terminate Hicks, and Page agreed with the decision. On June 28, 1982, Hicks was summoned to Brown Group's corporate offices for a meeting with Page and Williams. Page informed Hicks that he was chosen to be terminated as a result of the changes in operation at the Benton terminal. Page told Hicks that Chester was being retained because he had more experience on the raw materials dock, knew more about the Benton terminal operation, and was better able to handle the job.

After his June 28, 1982 meeting with Page and Williams in Clayton, Hicks returned that same afternoon to the Benton terminal to gather his personal belongings and say good-bye to his co-workers on the night shift. While he was at the terminal, Hicks asked Williams whether he had been terminated because he was white and Chester was black. Hicks testified that although Williams heard and understood his question, Williams did not deny that race was a consideration, instead replying "Ken, you said that, not me." Hicks did not understand this response, so he asked Williams a second time whether race made a difference. Hicks testified that Williams looked at him with a side smirk, and said, "Again, you said that, not me."[11] After Hicks' termination, Williams transferred Chester to the evening shift, and Page ordered that Chester be given a $25.00 raise. Brown Group did not hire another supervisor to replace Hicks.

Hicks exhausted his administrative remedies and filed suit in federal district court, alleging that Brown Group's decision to discharge him violated Section 1981 and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1982 & Supp. V 1987).

The case was tried before a jury on October 3–5, 1988. The jury rejected Hicks' age discrimination claim,[12] Special Interrogatories Nos. 1–3, but found that Brown Group had intentionally discriminated against Hicks on the basis of his race "in that his race was a discernible or motivating factor in his termination from employment," Special Interrogatory No. 7. The jury also found that Brown Group "intentionally discriminated against ... Hicks on account of his race in that his race was a determining factor in his termination from employment," Special Interrogatory No. 5. The jury found that Hicks was entitled to no compensatory damages, but awarded him $10,000 in punitive damages after finding that Brown Group "acted out of evil motive or intent, or acted with callous indifference to [Hicks'] federally protected rights," Special Interrogatory No. 8. Finally, in response to Special Interrogatory No. 10, the jury found that Brown Group would have terminated Hicks even if his race or age had "not been a discernible or motivating factor or a determining factor in the decision to terminate." The jury was not requested to consider the question of nominal damages.

After modifying the jury verdict through a grant of additur in the amount of $1.00 nominal damages, the district court enforced the jury verdict by awarding Hicks $10,000 in punitive damages. Brown Group's motion for a JNOV and Hicks' motion for post-trial equitable relief were denied. The district court subsequently awarded Hicks $18,562.50 in attorneys' fees and $2,189.00 in costs. This timely appeal and cross-appeal followed. After the United States Supreme Court decision in *Patterson v. McLean Credit Union*, 491 U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), this court granted leave for the parties to file supplemental briefs.

---

**11.** Williams admitted that he had a conversation with Hicks on the afternoon of June 28, 1982, but testified he told Hicks that race was not a factor in his termination. Williams testified that he answered Hicks's question directly the first time Hicks asked it, and that he did not smirk at Hicks. Brown Group argued to the jury that Hicks's description of this conversation was inconsistent and had been embellished over time. The jury evidently chose to reject Brown Group's contention that Hicks' testimony on this incident was fabricated or inconsistent.

**12.** Hicks has not cross-appealed the jury verdict on the age discrimination claim.

## II. Section 1981

■ The threshold question we must address in this reverse race discrimination case is whether racially discriminatory discharge is actionable under Section 1981. Section 1981 provides as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

In *Patterson v. McLean Credit Union*, 491 U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (*Patterson*), the United States Supreme Court limited the scope of Section 1981. The Court interpreted the meaning and scope of the rights "to make and enforce contracts," and held that neither right extended to prohibit racial harassment in the employment relationship. *Id.* at 2373–74. The *Patterson* decision did not address whether discriminatory discharge falls within the ambit of the rights to make and enforce contracts. Based on our examination of the nature of discharge and our interpretation of Section 1981, as well as the legislative history of Section 1981, we conclude that a claim for discriminatory discharge continues to be cognizable under Section 1981.

### A.

We must first determine whether a fair reading of *Patterson* requires us to find that discriminatory discharge is no longer actionable under Section 1981. A careful analysis of *Patterson* demonstrates that discharge was not at issue or discussed, and nothing in that opinion requires us to overrule the numerous and long-settled cases in this circuit which hold that discriminatory discharge is actionable under Section 1981. *See, e.g., Estes v. Dick Smith Ford*, 856 F.2d 1097, 1100–01 (8th Cir. 1988); *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1268 (8th Cir.1981); *Person v. J.S. Alberici Constr. Co.*, 640 F.2d 916, 918–19 (8th Cir.1981).

We first examine the facts and procedural history of *Patterson* in order to better understand its analysis of the rights to make and enforce contracts. In *Patterson*, the plaintiff was a black woman who was employed as a teller and file coordinator for ten years before being laid off. She brought an action in the United States District Court for the Middle District of North Carolina, alleging that her employer had harassed her, failed to promote her, and discharged her because of her race in violation of Section 1981.[13] 109 S.Ct. at 2368–69. The district court submitted the Section 1981 discharge and promotion claims to the jury, which returned a verdict for the employer. The district court determined that Patterson's claim for racial harassment was not actionable under Section 1981, and granted a directed verdict in favor of the employer.

On appeal,[14] the Fourth Circuit affirmed. *Patterson v. McLean Credit Union*, 805 F.2d 1143 (4th Cir.1986). The court held that racial harassment was not cognizable under Section 1981, but noted that evidence of racial harassment may implicate the

---

13. The plaintiff also raised a pendent state law claim for the intentional infliction of emotional distress. The district court granted a directed verdict for the employer on this issue, and the Fourth Circuit affirmed. *See Patterson v. McLean Credit Union*, 805 F.2d 1143, 1146 (4th Cir.1986).

14. The plaintiff appealed the district court's award of directed verdicts in favor of the employer on the Section 1981 racial harassment claim and the pendent state law claim for intentional infliction of emotional distress. *Patter-son v. McLean Credit Union*, 805 F.2d 1143, 1145–46 (4th Cir.1986). The plaintiff also appealed the exclusion of proffered testimony by two witnesses, one in support of her harassment claim and the other in support of her promotion claim. *Id.* at 1147. Finally, the plaintiff also appealed a jury instruction which required her to prove that she was more qualified than the person promoted in order to prevail on her Section 1981 promotion claim. *Id.* The plaintiff did not appeal the jury verdict rejecting her Section 1981 discharge claim.

terms and conditions of employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1982), or be probative of the discriminatory intent required to prove a Section 1981 violation. *Id.* at 1145. In discussing its ruling on the harassment claim, the Fourth Circuit expressly noted that a claim of discriminatory discharge goes to the very essence of the employment contract, and thus falls easily within Section 1981's protection. *Id.*

The Supreme Court granted certiorari, *see* 484 U.S. at 814, 108 S.Ct. at 65, 98 L.Ed.2d 29 (1987), to decide two questions: (1) whether Patterson's racial harassment claim was actionable under Section 1981, and (2) whether a jury instruction requiring her to prove that she was better qualified to establish her Section 1981 promotion claim was erroneous. *Patterson,* 109 S.Ct. at 2369. After initial oral argument, the Court requested the parties to brief and argue whether or not the Court should reconsider the interpretation of Section 1981 adopted in *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (*Runyon*), which held that Section 1981 prohibited discrimination in the making and enforcement of private contracts. *See* 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed.2d 879 (1988).

The Court unanimously agreed that *Runyon* should not be overruled. Justice Kennedy, writing for a 5–4 majority, held that *Runyon* should not be overruled because no special justification was shown to warrant departure from the principle of *stare decisis,* the decision had not proved unworkable, and "*Runyon* [was] entirely consistent with our society's deep commitment to the eradication of discrimination based on a person's race or the color of his or her skin." *Patterson,* 109 S.Ct. at 2371.[15] The Court then considered whether Patterson's racial harassment and failure to promote claims fell within either of the two enumerated contract rights protected by Section

1981. The Court noted that the most obvious feature of Section 1981 is that it forbids discrimination only in the making and enforcement of contracts, and that it could not be construed as a general proscription of racial discrimination in all aspects of contract relations. *Id.* at 2372.

The two enumerated contract rights protected by Section 1981 are the rights to make and enforce contracts. The first of these rights, the right to make contracts, prohibits the discriminatory refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. *Id.* at 2372. The Court held that "the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* at 2373. The Court noted that such postformation conduct is more naturally governed by state contract law and Title VII. *Id.* The second contract right protected by Section 1981, the right to enforce contracts, prohibits racial discrimination in the legal process which prevents individuals from enforcing their contract rights. *Id.* The right to enforce contracts covers statutory and "wholly *private* efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes" to enforce the terms of a contract. *Id.* (emphasis in original). The Court held that interpreting Section 1981 as protecting enumerated rights rather than as a general proscription of racial discrimination also "preserve[d] the integrity of Title VII's procedures without sacrificing any significant coverage of the civil rights laws." *Id.* at 2375.

Applying these principles to the issues raised by the plaintiff, the Court held that her racial harassment claim was not actionable under Section 1981 because it involved postformation conduct relating to the

---

**15.** Justice Brennan, concurring in the judgment in part and dissenting in part, joined by Justices Marshall and Blackmun, agreed that *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), should not be overruled, but for different reasons than the majority. Justice Brennan argued that *Runyon* should not be overruled because it was correctly decided. *See Patterson,* 109 S.Ct. at 2379–85, and because Congress effectively ratified the interpretation of Section 1981 adopted in *Runyon. See id.* at 2385–88.

terms and conditions of continuing employment, rather than a refusal to make a contract or an impairment of her ability to enforce her established contract rights. *Id.* at 2374. In contrast, the Court held that the plaintiff's failure to promote claim was actionable if the denied promotion "rises to the level of an opportunity for a new and distinct relation between the employee and employer." *Id.* at 2377. The Supreme Court affirmed the Fourth Circuit's dismissal of Patterson's Section 1981 racial harassment claim, but vacated its judgment as it related to Patterson's discriminatory promotion claim and remanded the case for further proceedings.[16] *Id.* at 2377. The opinion does not discuss whether discharge is encompassed within the rights to make or enforce contracts.[17]

The Supreme Court's decision in *Jett v. Dallas Independent School District,* —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (*Jett*), decided one week after *Patterson,* clarifies that *Patterson* did not resolve whether discriminatory discharge continues to be actionable under Section 1981. In *Jett,* the Supreme Court considered the Section 1981 and 42 U.S.C. § 1983 (1982) due process, First Amendment, and reverse discrimination claims of a white male teacher and football coach who had been removed from his coaching duties, reassigned to another teaching position at a different school, and constructively discharged from his employment. *Id.* at 2708. Before addressing whether a municipality could be held liable for the Section 1981 violations of its employees under *respondeat superior,* the Court noted that at no stage of the proceedings had the school district argued that the right to make contracts did not reach the injuries suffered by the petitioner. *Id.* at 2709. Accordingly,

the Court "assume[d] for purposes of these cases, without deciding, that petitioner's rights under § 1981 have been violated by his removal and reassignment." *Id.* at 2710. The Supreme Court recently reaffirmed that *Patterson* did not resolve whether discriminatory discharge is actionable under Section 1981. *See Lytle v. Household Mfg., Inc.,* —— U.S. ——, —— n. 3, ——, 110 S.Ct. 1331, 1336 n. 3, 1337, 108 L.Ed.2d 504 (O'Connor, J., concurring) (Mar. 20, 1990).

We believe the fact that the *Patterson* Court did not intend to reach the discharge question is conclusively established by the failure of that decision to make any reference, favorable or unfavorable, to the substantial body of Supreme Court Section 1981 jurisprudence developed in cases involving Section 1981 discharge claims. *See, e.g., Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (case involving discriminatory discharge claims where Supreme Court held that state statute of limitations for personal injury actions governs Section 1981 claims, and union that intentionally fails to assert discrimination claims violates Section 1981); *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (discriminatory discharge case where Supreme Court held that Arab national is entitled to the protections of Section 1981 if he can show that he was subjected to intentional discrimination because of his Arab birth); *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (discharge case in which Supreme Court held that the Section 1981 statute of limitations begins running on the date the allegedly discriminatory act—the denial of tenure—occurred);

16. The Court held that the district court erred in requiring the plaintiff to prove she was better qualified than the individual promoted in order to establish her Section 1981 promotion claim. *Patterson,* 109 S.Ct. at 2377–79. The Court noted that establishing she was better qualified was only one of several ways that the plaintiff could prove that the employer's stated reason for its failure to promote her was pretextual.

17. Several post-*Patterson* cases have noted that *Patterson* did not decide whether discharge ac-

tions may still be brought under Section 1981. *See e.g., Carroll v. Elliott Personnel Servs.,* 51 Fair Empl.Prac.Cas. (BNA) 1173, 1175 (D.Md. 1989); *Padilla v. United Airlines, Inc.,* 716 F.Supp. 485, 489 (D.Colo.1989); *Bush v. Union Bank,* 1989 U.S. Dist. LEXIS 10936, *4 (W.D.Mo. September 12, 1989); *Greggs v. Hillman Distrib. Co.,* 719 F.Supp. 552, 554 (S.D.Tex.1989); *Hall v. County of Cook,* 719 F.Supp. 721, 723 (N.D.Ill. 1989).

*McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 275, 96 S.Ct. 2574, 2576, 49 L.Ed.2d 493 (1976) (employer who discharges a white employee because of his race violates Section 1981); *Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975) (Supreme Court cites lower court Section 1981 discharge cases to support its holding that Section 1981 affords a federal remedy in wrongful discharge case against discrimination in private employment on the basis of race).[18] We believe that if the Supreme Court intended to call into question or overrule this substantial body of employment discrimination precedent in *Patterson,* it would have said so. We do not believe that the Supreme Court would reject by implication such seminal Section 1981 cases without so much as even a word.

We also find it significant that the majority took issue with substantial portions of Justice Brennan's opinion dissenting in part, *see Patterson,* 109 S.Ct. at 2371 n. 1, 2376–77, but did not object to his statement that Section 1981 continues to provide a cause of action for discriminatory discharge. *See id.* at 2388 (in enacting Section 1981, Congress intended "to go beyond protecting the freedmen from refusals to contract for their labor *and from discriminatory decisions to discharge them*") (emphasis added) (Brennan, J., concurring in the judgment in part and dissenting in part). We also note that one of the most common uses of Section 1981 is in discriminatory discharge actions. *See generally*

Eisenberg & Schwab, *The Importance of Section 1981,* 73 Cornell L.Rev. 596, 599–601 (1988) (analyzing number of Section 1981 employment discrimination claims filed in three federal district courts in fiscal year 1980–81). In light of the large number of Section 1981 discharge claims brought in the federal courts, we believe the Supreme Court would have at least expressed doubt about the continuing viability of such causes of action after *Patterson.*

It is important to note that we intend or imply no criticism of the Supreme Court for not reaching the discharge issue in *Patterson.* The plaintiff did not appeal the jury verdict rejecting her discharge claim, and hence this issue was not before the Court. Legal questions are best decided in cases which present concrete controversies.[19] We simply decline, in light of *Patterson*'s uncertain scope, to apply an oblique decision to overrule the clear and undisputed precedent of this circuit.

### B.

Having established that *Patterson* did not address whether discharge is prohibited by Section 1981, we now must decide whether discriminatory discharge is actionable under either the right to make or the right to enforce contracts. Because protection from racially motivated deprivations of contracts is essential to the full enjoyment of the right to *make* contracts, we hold that discriminatory discharge continues to be actionable under Section 1981.[20] Dis-

18. In addition, prior to *Patterson* this court and virtually every other circuit had held that discriminatory discharges are covered by Section 1981. *See, e.g., Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1100–01 (8th Cir.1988) (*Estes*); *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1420 (7th Cir.1986); *Connor v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1498–99 (11th Cir.1985).

19. We agree with Judge Posner's eloquent discussion of the uncertain scope of *Patterson,* and the necessity of further cases to flesh out its parameters:

> We show no disrespect to the Supreme Court by suggesting that the scope of *Patterson* is uncertain. The glory of the Anglo–American system of adjudication is that general principles are tested in the crucible of concrete

controversies. A court cannot be assumed to address and resolve in the case in which it first lays down a rule every controversy within the semantic reach of the rule.

*Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1312 (7th Cir.1989) (*Malhotra*) (implying but not deciding that retaliatory discharge claims continue to be actionable under Section 1981 after *Patterson*).

20. While discharge impairs the right to *make* contracts, it does not ordinarily impair the right to *enforce* contracts as described in *Patterson. See* 109 S.Ct. at 2373. The discharged employee is free to simply go into court and file suit. However, when an employer retaliates against an employee by discharging her for attempting to enforce her Section 1981 rights, this very well

charge is fundamentally different from racial harassment or discrimination in the terms or conditions of employment. An employee who is harassed or subjected to discriminatory terms or conditions of employment still receives the fundamental benefit of his or her employment contract—the employment itself—even though that employment may be unpleasant, degrading, or obnoxious. In distinction, discriminatory discharge goes to the very existence and nature of the employment contract. A discriminatory discharge completely deprives the employee of his or her employment, the very essence of the right to make employment contracts.

When construing Section 1981, we are mindful of our obligation to construe a statute in a fashion which gives meaningful effect to the rights it confers, not to negate them. *McCown v. Heidler*, 527 F.2d 204, 207 (10th Cir.1975). In fact, we are required to generously interpret the Civil Rights Act of 1866, from which Section 1981 is derived, " 'accord[ing] it a sweep as broad as its language.' " *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437, 88 S.Ct.

2186, 2202, 20 L.Ed.2d 1189 (1968) (*Jones*) (quoting *United States v. Price*, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)).[21] We refuse to construe Section 1981 as prohibiting an employer from refusing to hire someone based on her race, but then permitting the discharge of that same employee because of her race a month or a year later. Such an absurd interpretation would allow discriminatory discharge to effectively annihilate the right to make contracts. The right to make contracts would be rendered virtually meaningless unless it encompasses the right to be free from discriminatory deprivations of such contracts. In order to give meaning to the right to make contracts free from discrimination, the right to be free from discriminatory discharge must be implied. *See Luria v. United States*, 231 U.S. 9, 24, 34 S.Ct. 10, 13, 58 L.Ed. 101 (1913) (that which is clearly implied in a statute is as much a part of the law as what is expressed).[22] Accordingly, we hold that discriminatory discharge directly affects the right to make contracts, and therefore is cognizable under Section 1981.[23]

may impair the employee's ability to enforce her contract rights within the meaning of Section 1981 because it may intimidate her into refraining from resorting to the legal process to vindicate her Section 1981 rights. *See Malhotra*, 885 F.2d at 1314 n. 1 (Cudahy, J., concurring) (noting in dicta that retaliatory discharge continues to be actionable after *Patterson* ); *English v. General Dev. Corp.*, 717 F.Supp. 628, 632–33 (N.D.Ill.1989) (*Patterson* leaves retaliatory discharge action intact); *Jordan v. U.S. West Direct Co.*, 716 F.Supp. 1366, 1368–69 (D.Colo.1989) (retaliation claims actionable after *Patterson* under right to enforce contract). *But see Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1534–35 (11th Cir.1990); (retaliatory discharge no longer actionable under Section 1981 after *Patterson* ); *Overby v. Chevron USA, Inc.*, 884 F.2d 470, 472–73 (9th Cir.1989) (same); *Alexander v. N.Y. Medical College*, 721 F.Supp. 587, 588 (S.D.N.Y.1989) (same); *Williams v. National R.R. Passenger Corp.*, 716 F.Supp. 49, 51–52 (D.D.C.1989) (retaliation not actionable under Section 1981 because right to enforce contracts unimpeded); *Dangerfield v. Mission Press*, 50 Fair Empl.Prac.Cas. (BNA) 1171, 1172 (N.D. Ill.1989) (same). *Cf. Fowler v. McCrory Corp.*, 727 F.Supp. 228 (D.Md.1989) (white employee discharged after filing complaint with local agency claiming that employer directed him not to hire all blacks has a cause of action under Section 1981 for violation of his own right to

"give evidence," and has third-party standing to assert a violation of blacks' Section 1981 right to make contracts).

**21.** Recognizing the extent and urgency of the crisis in which the Reconstruction civil rights statutes were promulgated, the Supreme Court has extended its policy of broad interpretation to other Reconstruction Era civil rights statutes as well. *See Griffin v. Breckenridge*, 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971) (interpreting 42 U.S.C. § 1985(3) (1982)); *Price*, 383 U.S. at 801, 86 S.Ct. at 1160 (interpreting 18 U.S.C. § 241 (1988)). *See also Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583 at 591–92 (7th Cir.1989) (noting broad construction rule, court interprets 42 U.S.C. § 1985(3) to cover civil conspiracies motivated by racial animus towards whites).

**22.** *See also Malhotra*, 885 F.2d at 1314 (7th Cir.1989) (Cudahy, J., concurring) (A prohibition against retaliation is a "necessary adjunct" to Section 1981 because "[i]f an employee may be fired for complaining of discrimination, his [or her] right not to be discriminated against is surely vitiated").

**23.** We find the dissent noteworthy not for the issues it resolves, but for the questions it raises and leaves unanswered. For instance, the dis-

We believe that construing the right to make contracts as encompassing the right to be free from discriminatory discharge does not unduly strain the language of Section 1981. *See Patterson*, 109 S.Ct. at 2377. We do not deny that the right to make contracts is reasonably susceptible to an interpretation which does not extend its protection to prohibit discrimination after the contract has been formed.[24] Nonetheless, in our view, postformation discharge continues to be actionable under the right to make contracts when it totally deprives the victim of the fundamental benefit the right to make contracts was intended to secure—the contractual relationship itself. Indeed, the *Patterson* Court indicated that it is appropriate to examine postformation conduct in certain circumstances

to determine whether the right to make contracts has been violated. *See* 109 S.Ct. at 2376–77.

Nor will permitting Section 1981 actions for discriminatory discharge subvert Title VII's preference for mediation and conciliation. *See id.* at 2374–75. After an employee is discharged, the employment relationship is severed. At this point, there is no relationship to salvage. The absence of an employment relationship makes discharge equivalent to a refusal to contract. *Patterson* notes that a refusal to enter a contract on the basis of race would continue to be actionable under Section 1981 and Title VII, *id.* at 2375, but the Court was not troubled by the overlap because the interest in preserving the integrity of Title VII procedures is lessened considerably when

---

sent suggests that we have applied a different standard in analyzing Hicks' claim than the Supreme Court applied in *Patterson, post* at 656, but fails to explain with particularity in what respect we have departed from *Patterson*. Moreover, although the dissent concedes that *Patterson* did not address whether discharge is actionable under Section 1981, *post* at 656, it nevertheless purports to resolve the discharge issue by quoting the *Patterson* holding on harassment, substituting "harassment" with the words "discriminatory discharge" in parentheses. *Post* at 657. We agree that *Patterson* held that racial harassment is not actionable under Section 1981. However, we do not believe that merely inserting "discriminatory discharge" into the Supreme Court's holding on harassment sheds light on the question of whether discriminatory discharge is prohibited by the rights to make and enforce contracts.

**24.** We recognize that a number of federal courts have found, often summarily, that discharge is no longer actionable under Section 1981 after *Patterson. See, e.g., Rivera v. A.T. & T. Information Sys., Inc.,* 719 F.Supp. 962, 964–65 (D.Colo. 1989); *Hall v. County of Cook, Illinois,* 719 F.Supp. 721, 723–24 (N.D.Ill.1989); *Crader v. Concordia College,* 724 F.Supp. 558, 562 (N.D.Ill. 1989); *Alvarez v. Norden Systems, Inc.,* 1989 WL 99837, 1989 U.S.Dist LEXIS 9954, at 15 (S.D. N.Y. August 24, 1989); *Bush v. Union Bank,* 1989 WL 201599, 1989 U.S.Dist. LEXIS 10936, at 2–4 (W.D.Mo.1989); *Copperidge v. Terminal Freight Handling Co.,* 50 Fair Empl.Prac.Cas. (BNA) 812 (W.D.Tenn.1989); *Greggs v. Hillman Distributing Co.,* 719 F.Supp. 552 (S.D.Tex.1989); *Leong v. Hilton Hotels,* 50 Fair Empl.Prac.Cas. (BNA) 738 (D.D.C.1989). *Cf. Carroll v. General Accident Ins. Co.,* 891 F.2d 1174, 1175 (5th Cir. 1990) (without discussing discharge issue, court relies on *Patterson* harassment holding to reverse portions of jury verdict based solely on

Section 1981 in case where plaintiff had claimed racial harassment culminating in constructive discharge).

These courts have generally reasoned that discriminatory discharge is postformation conduct under *Patterson* and therefore no longer actionable under Section 1981. However, none of these decisions discuss the fundamental differences between discharge and conduct relating to the conditions of employment. Many of these cases fail to seriously consider the implications of *Patterson*'s failure to resolve the discharge issue. These decisions also do not consider the obligation of the courts to give meaningful protection to the right to make contracts, and the absurdity that would result if the employer must be nondiscriminatory in hiring but can then fire with impunity. Finally, none of these decisions consider the legislative history of the 1866 Act or Congress' desire to secure to the freedmen the full exercise of the right to make contracts regardless of the devices employed by opponents to avoid compliance. Because these factors were not adequately considered by the courts finding Section 1981 discharge actions precluded, we are not persuaded by them.

We also note that several courts have agreed with our conclusion that discriminatory discharge continues to be actionable under Section 1981 after *Patterson. See, e.g., Padilla v. United Airlines,* 716 F.Supp. 485, 490 (D.Colo.1989) (discriminatory discharge directly affects the right to make a contract contrary to Section 1981); *Carroll v. Elliott Personnel Servs.,* 51 Fair Empl. Prac.Cas. 1173 (BNA) (D.Md.1989); *Birdwhistle v. Kansas Power & Light,* 723 F.Supp. 570, 575 (D.Kan.1989) (discharge directly related to contact enforcement and is still actionable after *Patterson*); *Booth v. Terminix Int'l, Inc.,* 722 F.Supp. 675 (D.Kan.1989); *Gamboa v. Washington,* 716 F.Supp. 353 (N.D.Ill.1989) (constructive discharge).

an employment relationship does not exist. The Court held that "[a]t this stage of the employee/employer relation Title VII's mediation and conciliation procedure would be of minimal effect, for there is not yet a relation to salvage." *Id.* Similarly, allowing an employee to challenge his or her discriminatory discharge under either Section 1981 or Title VII will not undermine Title VII's mediation and conciliation procedures, because there is no longer an employment relationship to salvage.[25]

Our holding that discharge continues to be actionable under Section 1981 also fulfills our obligation to interpret Section 1981 and 42 U.S.C. § 1982 [26] (1982) (Section 1982) coextensively. Both Sections 1981 and 1982 are derived from Section 1 of the Civil Rights Act of 1866.[27] *See General Building Contractors Assoc. v. Pennsylvania,* 458 U.S. 375, 384, 102 S.Ct. 3141, 3146, 73 L.Ed.2d 835 (1982); *Runyon,* 427 U.S. at 170, 96 S.Ct. at 2594; *Jones,* 392 U.S. at 422, 88 S.Ct. at 2194. Because of their common origin, the Supreme Court

has held that where possible, the two sections should be given a common interpretation, *Tillman v. Wheaton–Haven Recreation Ass'n,* 410 U.S. 431, 439, 93 S.Ct. 1090, 1094, 35 L.Ed.2d 403 (1973), and in fact the Court consistently has given the sections consistent interpretations, *see id.* at 440, 93 S.Ct. at 1094; *Runyon,* 427 U.S. at 170–73, 96 S.Ct. at 2594–96; *Shaare Tefile Congregation v. Cobb,* 481 U.S. 615, 617–18, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987) (same definition of race governs Section 1981 and 1982 actions). In *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 236–37, 90 S.Ct. 400, 404–05, 24 L.Ed.2d 386 (1969) (*Sullivan* ), the Supreme Court held that Section 1982 was violated when a white property owner was deprived of his property for advocating the rights of a black tenant. The *Sullivan* Court thus found that Section 1982 protects the right to acquire property *and* the right to keep it. By construing Section 1981 to include the right to keep a job as well as the right

---

**25.** By noting that our holding does not undermine Title VII's preference for *mediation* and conciliation, we do not mean to suggest that the scope of Section 1981 should vary depending on whether a parallel statutory scheme such as Title VII exists. Section 1981 prohibits discrimination in the making and enforcement of contracts generally. *See, e.g., Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (Section 1981 prohibits a private school from refusing to contract with black students because of their race); *Tillman v. Wheaton–Haven Recreational Ass'n,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973) (Section 1981 prohibits a community recreational association from denying membership based on race). *See also Patterson,* 109 S.Ct. at 2390 ("Section 1981 is a statute of general application, extending not just to employment contracts but to *all* contracts") (emphasis in original) (Brennan, J., concurring in the judgment in part and dissenting in part). Moreover, Section 1981 is not limited to discrimination in businesses with 15 or more employees, *cf.* 42 U.S.C. § 2000e(b) (Title VII applies to "person[s] engaged in an industry affecting commerce who has fifteen or more employees ..."), and hence may protect the approximately 15% of the workforce not covered by Title VII. *Id.* We refer to Title VII only to demonstrate that in discharge cases such as this, where the coverages of Title VII and Section 1981 do overlap, the mediation and conciliation procedures of Title VII are not undermined by allowing Section 1981 actions because an employment relationship no longer exists.

**26.** 42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

**27.** Section 1 of the Civil Rights Act of 1866 provided as follows:

Be it enacted by the Senate and House of Representatives of the United States in Congress assembled, That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, *shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties as to none other,* any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

Act of April 9, 1866, C. 31, § 1, 14 Stat. 27 (emphasis added to text currently codified at Sections 1981 and 1982).

to acquire one, we effectuate the rule favoring consistent interpretations of Sections 1981 and 1982.

Moreover, our holding that discharge continues to be actionable under Section 1981 is in consonance with the unwavering commitment of all three branches of the federal government to the eradication of racial discrimination,[28] and the special obligation of the federal courts to protect civil rights.[29] Absent clear direction from the Supreme Court, we will not infer that discharge from employment, the most severe employment injury of all, is no longer cognizable under Section 1981.[30]

## C.

The legislative history of the Civil Rights Act of 1866 (1866 Act) supports our conclusion that Section 1981 prohibits discharges based on race.[31] We will consider the con-

**28.** *See, e.g., Patterson,* 109 S.Ct. at 2371 (*"Runyon* is entirely consistent with our society's deep commitment to the eradication of discrimination based on a person's race or the color of his or her skin"), *id.* at 2379 ("The law now reflects society's consensus that discrimination based on the color of one's skin is a profound wrong of tragic dimensions. Neither our words nor our decisions should be interpreted as signaling one inch of retreat from Congress' policy to forbid discrimination in the private, as well as the public, sphere"), *id.* at 2380 (Brennan, J., concurring in part in the judgment and dissenting in part) (commitment to eradicate discrimination the "product of a national consensus that racial discrimination is incompatible with our best conception of our communal life, and with each individual's rightful expectation that her full participation in the community will not be contingent upon her race"); *Bob Jones Univ. v. United States,* 461 U.S. 574, 593, 103 S.Ct. 2017, 2029, 76 L.Ed.2d 157 (1983) ("every pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination"); *Emporium Capwell Co. v. Western Addition Community Org.,* 420 U.S. 50, 66, 95 S.Ct. 977, 986, 43 L.Ed.2d 12 (1975) ("[p]lainly, national labor policy embodies the principles of nondiscrimination as a matter of highest priority").

**29.** *See, e.g., Patsy v. Bd. of Regents,* 457 U.S. 496, 503, 102 S.Ct. 2557, 2561, 73 L.Ed.2d 172 (1982); *Mitchum v. Foster,* 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972); *Ex parte Virginia,* 100 U.S. 339, 346, 25 L.Ed. 676 (1880). *See generally* Belknap, *Federalism and the Protection of Civil Rights,* 86 Colum.L.Rev. 1741 (1986); Chambers, *Protection of Civil Rights: A Constitutional Mandate for the Federal Government,* 87 Mich.L.Rev. 1599 (1989).

**30.** Our holding that discriminatory discharge is prohibited by Section 1981 also furthers the deterrent purposes of Section 1981. *See Edwards v. Jewish Hosp.,* 855 F.2d 1345, 1351 (8th Cir.1988) (*Edwards*) (acknowledging deterrent purposes underlying Section 1981). Facilitating the deterrence objectives of Section 1981 in employment relationships is particularly important because of the debilitating chain reaction that racially motivated discharge from employment may trigger. *See id.* at 1349 ("racial discrimination takes its most malevolent form when it occurs in employment, for prejudice here not only has an immediate economic effect, it has a fulminating integrant that perpetrates the pestilences of degraded housing, unsatisfactory neighborhood amenities, and unequal education") (citation omitted).

**31.** Because the meaning of the right to make contracts as formulated in the *Patterson* opinion is ambiguous as to whether it encompasses discharge, it is appropriate to turn to the legislative history of Section 1981 to ascertain whether it sheds light on the problem. *See Public Citizen v. United States Dep't of Justice,* —— U.S. ——, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989) ("[w]here the literal reading of a statutory term would 'compel an odd result,' we must search for other evidence of congressional intent to lend the term its proper scope") (quoting *Green v. Bock Laundry Mach. Co.,* —— U.S. ——, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989)).

Our resort to legislative history is further supported by the fact that the Supreme Court has consistently interpreted both Sections 1981 and 1982 with reference to legislative history. *See, e.g., Jett v. Dallas Indep. School Dist.,* —— U.S. ——, 109 S.Ct. 2702, 2711–15, 105 L.Ed.2d 598 (1989) (post-*Patterson* case in which Supreme Court considers legislative history of Section 1981 at length to determine whether 39th Congress intended to create a cause of action for damages against municipal actors and others who violated the rights now enumerated in Section 1981); *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 612–13, 107 S.Ct. 2022, 2027–28, 95 L.Ed.2d 582 (1987) *(Al-Khazraji)* (discusses statements by members of Congress regarding their understanding of "race" to ascertain whether Arab national is entitled to the protections of Section 1981); *Shaare Tefile Congregation v. Cobb,* 481 U.S. 615, 617–18, 107 S.Ct. 2019, 2020, 95 L.Ed.2d 594 (1987) (based on legislative history developed in *Al-Khazraji,* Court holds that Jews were viewed as a distinct race at the time the Civil Rights Act of 1866 was passed, and thus entitled to protections of Section 1982); *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 287–95, 96 S.Ct. 2574, 2582–86, 49 L.Ed.2d 493 (1976) (Court relies on legisla-

text within which the 1866 Act was passed, the evidence before Congress at the time it considered the Act, and the Congressional debates themselves.[32]

Before considering the question of whether racially motivated discharges fall within the scope of the 1866 Act as envisioned by the 39th Congress, it is important to take note of the context in which this Act was proposed, debated and passed.[33] The radical and fundamental changes occasioned by the Civil War and the abolition of slavery are well-documented elsewhere and need not be recounted at great length here.[34] Suffice it to state that this country had just suffered through the Civil War, a terrible conflict which cost the most lives of any war in American history. The Civil War was unique because it did not present an external enemy, but divided the country, pitting two competing economic systems and ways of life against one another, each vying for dominance. What began as a

war to preserve the Union was gradually transformed into a war to abolish slavery and inequality based on race. *See* Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 Yale L.J. 541, 548–49 (1989) (*Historical Reconstruction*). Despite the northern victory, public and private efforts to continue the subjugation and degradation of the freed slaves were rampant in the South.

The thirteenth amendment was ratified on December 6, 1865.[35] Despite the ratification of the amendment, many members of Congress believed that broader and more explicit statutory guarantees were necessary if the newly freed slaves were to have "more than parchment rights." J. tenBroek, Equal Under Law, at 175 (1965). In early 1866, the 39th Congress was well aware of the ubiquitous public and private discrimination against the freedmen in the

tive history to determine that whites are entitled to protections of Section 1981); *Runyon*, 427 U.S. at 168 n. 8, 96 S.Ct. at 2593 n. 8 (discusses legislative history of Civil Rights Act of 1866 to determine significance of its reenactment in 1870 and codification in 1874); *Tillman v. Wheaton–Haven Recreation Ass'n*, 410 U.S. 431, 435, 93 S.Ct. 1090, 1093, 35 L.Ed.2d 403 (1973) (construction of Section 1982 developed from "a detailed review of the legislative history"); *Jones*, 392 U.S. at 422–37, 88 S.Ct. at 2194–95 (detailed review of legislative history to determine what types of discrimination Section 1982 was intended to prevent). *See generally* Note, *The Supreme Court, 1988 Term: Leading Cases*, 103 Harv.L.Rev. 137, 336–37 & n. 47 (1989).

**32.** We are wary of reading too much into legislative history, but believe that the legislative history of the 1866 Act is sufficiently compelling to illuminate and buttress our interpretation of Section 1981. *See* Sullivan, *Historical Reconstruction, Reconstruction History and the Proper Scope of Section 1981*, 98 Yale L.J. 541, 542 (1989) (*Historical Reconstruction*) ("most matters of historical interpretation necessarily involve probabilities, not certainties").

**33.** *See General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 386, 102 S.Ct. 3141, 3147, 73 L.Ed.2d 835 (1982) (when interpreting Section 1981, one "must be mindful of the events and passions of the time in which the law was formed") (citation omitted); *United States v. Price*, 383 U.S. 787, 804, 86 S.Ct. 1152, 1162, 16 L.Ed.2d 267 (1966) ("The purpose and scope of the 1866 and 1870 enactments must be viewed against the events and passions of the time").

Historians have cautioned on the dangers inherent in citing isolated quotations from Reconstruction Era congressional debates without understanding the conditions Congress faced and the ideological beliefs of the Republican majorities in Congress. *See* E. Foner, Reconstruction: America's Unfinished Revolution, 1863–77, at 257 n. 53 (1988) (Reconstruction).

**34.** For discussions of the changes wrought by the Civil War and the increase in the scope of federal authority which resulted, see Reconstruction, at 228–80; J. McPherson, Battle Cry of Freedom: The Civil War Era, at 859–62 (1988); R. Kaczorowski, The Politics of Judicial Interpretation: The Federal Courts, Department of Justice and Civil Rights, 1866–1876, at 1 (1985) ("Between the years 1866 and 1873, a legal theory of national civil rights enforcement authority emerged in the courts of the United States that manifested a revolutionary impact of the Civil War upon the constitutional and legal structure of American federalism."); *Historical Reconstruction*, 98 Yale L.J. at 547–56, 561–64; Kaczorowski, *Revolutionary Constitutionalism in the Era of the Civil War and Reconstruction*, 61 N.Y.U.L.Rev. 863, 874–84 (1986) (*Revolutionary Constitutionalism*).

**35.** The thirteenth amendment provides:
Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
Section 2. Congress shall have power to enforce this article by appropriate legislation.

South.[36] Many Republicans believed that such discrimination threatened to make a mockery of the thirteenth amendment, if not actually precipitate a return to slavery. *See Historical Reconstruction,* 98 Yale L.J. at 548. Many northerners had come to the uneasy conviction "that somehow the South had never really surrendered after all." *See* Kaczorowski, *Revolutionary Constitutionalism in the Era of the Civil War and Reconstruction,* 61 N.Y.U.L.Rev. 863, 871 (1986) (*Revolutionary Constitutionalism*). As a result, some in Congress came to believe that the enactment of legislation protecting the freedmen was necessary in order to codify into law the military resolution of the Civil War. *Id.* A major focal point of the conflict between the Republican Congress and the South concerned the establishment of a free labor contract system to replace slavery. On the one hand, many northerners and black leaders saw a vigorous free labor contract system as a key to practical freedom. They believed that the free labor contract would be a substitute for slavery and constitute the backbone of a totally new system. *See Historical Reconstruction,* 98 Yale L.J. at 549–50, 556. White southerners, on the other hand, "bitterly resisted the creation of a free labor market as implied by emancipation." E. Foner, Reconstruction: America's Unfinished Revolution, 1863–77, at 132 (1988) (Reconstruction) (citation omitted). Southerners insisted that "[f]ree labor assumptions—economic rationality, internal self-discipline, responsiveness to the incentives of the market—could never ... be applied to blacks." *Id.* White planters recognized that the free labor con-

tract would seal the demise of the plantation labor system, and bitterly resisted its implementation. In sum, the 39th Congress debated and passed the 1866 Act within a context characterized by the end of the Civil War, northern fear and anger over deprivations of freedmen rights in the South, and southern resistance to the implementation of the free labor contract system.[37]

At the time it considered the 1866 Act, the 39th Congress had before it substantial evidence documenting widespread denials of the freedmen's right to enjoy the meaningful benefits of contract. The debate over the 1866 Act effectively began with Congress' receipt of a report by Major General Carl Schurz on conditions in the South. S.Exec.Doc. No. 2, 39th Cong., 1st Sess. (1865) (Schurz Report). *See Jones,* 392 U.S. at 428–29, 88 S.Ct. at 2197–98; *Historical Reconstruction,* 98 Yale L.J. at 553. In addition to documenting the emergence of the Black Codes, the Schurz Report detailed the various private devices used to deny the freedmen their rights. *See e.g.,* Schurz Report at 17–20 (persecution and violence against freedmen), 21–22 ("General Ideas And Schemes Of Whites Concerning The Freedmen"). The Schurz report noted that even if all discriminatory statutes and orders were repealed, equal treatment would still not be secured. *Jones,* 392 U.S. at 429, 88 S.Ct. at 2198. Schurz was careful to note that the denial of equal treatment was particularly common in contract relations.

The Schurz Report placed substantial emphasis on southern resistance to the "new order of things"—the replacement of

---

**36.** *See Jones,* 392 U.S. at 427, 88 S.Ct. at 2197 ("'Accounts in newspapers North and South, Freedmen's Bureau and other official documents, private reports and correspondence were all adduced' to show that 'private outrage and atrocity' were 'daily inflicted on freedmen ...'") (quoting J. tenBroek, Equal Under Law, at 181 (1965)).

**37.** The importance of the free labor contract for reordering southern society, and the resistance its introduction engendered, has been succinctly described as follows:

> [Republican] leaders recognized that the abolition of slavery, having destroyed the labor system that had existed for two centuries in

the Southern states, necessarily called for the creation of a new labor system, for "the formation of new civil arrangements." ... Southern whites likewise conceived of the labor question as the driving issue of public policy ... Former masters were neither prepared nor disposed to deal with former slaves on the grounds assumed by free labor ideology. They struggled to recreate the discipline and control of a slave system, while the Freedmen struggled to discover freedom as independent workers.

*Historical Reconstruction,* 98 Yale L.J. at 549 (citation omitted).

slave labor with the free labor contract system. *See, e.g., id.* at 16–19, 21–22, 37–40. Schurz observed that the vast majority of southern whites believed that blacks simply would not work without physical compulsion, *id.* at 16 [38], and that only a small minority of southern whites were attempting to adopt to the new contract labor system. *Id.* at 38. Schurz warned that southern employers were attempting to "[a]dhere, as to the treatment of laborers, as much as possible to the traditions of the old system, even where the relations between employers and laborers had been fixed by contract." *Id.* at 19.

Significantly, Schurz reported that former masters generally did not refuse to contract with their former slaves, but instead undermined the establishment of the free labor system by refusing to pay wages earned or by trying to reintroduce practical slavery through the imposition of onerous contract terms. *See id.* at 22 ("many ingenious [southern] heads set about to solve the problem, how to make free labor compulsory"); *Historical Reconstruction,* 98 Yale L.J. at 553–54. Many southerners impeded the introduction of the contract system by "throw[ing] obstacles in its way," *id.* at 39, or by "adulter[ating] the new order of things by the admixture of elements belonging to the system of slavery." *Id.* at 40.

Schurz cogently summarized the problem facing the 39th Congress as follows:

> The true nature of the difficulties of the situation is this: The general government of the republic has, by proclaiming the emancipation of the slaves, commenced a great social revolution in the South, but has, as yet, not completed it. Only the negative part of it is accomplished. The slaves are emancipated in point of form but free labor has not yet been put in the place of slavery in point of fact.

Schurz Report at 38. In fact, Schurz was so concerned over southern resistance to the implementation of the free labor contract system that one of his key recommendations was to extend the time period of federal control over the southern states (and postpone their readmission into the Union) until the free labor contract system was firmly established. *See id.* at 39 ("The facts enumerated in this report, as well as the news we receive from the [S]outh from day to day, must make it evident to every unbiased observer that unadulterated free labor cannot be had at present, unless the national government holds its protective and controlling hand over it.").

The 39th Congress also considered the report of Major General Oliver O. Howard, the head of the Freedmen's Bureau. H.R. Exec.Doc. No. 11, 39th Cong., 1st Sess. (1866) (Howard Report). The Howard Report detailed the widespread use of corporal punishment, the fraudulent deprivation of freedmen's wages, the formation of combinations to extort the freedmen, and the general refusal of whites to fulfill their contracts with freedmen. *See* Howard Report at 25, 28, 30, 32. Howard believed that the southerner's reluctance to embrace the contract labor system arose from "the prejudice of the employer, and want of practical knowledge of any other system than the one under which he has been brought up …" *Id.* at 32. Howard also documented the important role of the Freedmen's Bureau in implementing the free labor system by exhorting parties to fulfill their contracts and resolving disputes when they arose. *See id.* at 32–35. Like Major General Schurz, Major General Howard focused on practical resistance to the implementation of the contract system through the devices of private parties. *See Historical Reconstruction,* 98 Yale L.J. at 554.

The Joint Committee of Fifteen on Reconstruction (Joint Committee) conducted hearings to examine conditions in the southern states contemporaneously with Congress' consideration of the 1866 Act. Testimony before the Joint Committee es-

---

**38.** *See also* Reconstruction, at 198 ("The ferment in the countryside, the history of other societies which had experienced emancipation, and ideologies and prejudices inherited from slavery, combined to convince the white South that only through some form of coerced labor could the production of plantation staples be resumed.").

tablished that although "[f]ormer masters generally were willing to go through the motions of 'contracting' with the Freedmen for their labor," the emancipated slaves did not receive the true benefits of the contract labor system because of the discriminatory imposition of low wages and onerous working conditions. Because former masters balked at paying fair wages, "there was no possibility that the freedmen would be able to contract *meaningfully* to sell their labor." *Id.* at 555 n. 95 (citing congressional testimony) (emphasis added).

Congress debated and passed the 1866 Act against this substantial evidence of resistance to the creation of an "unadulterated" contract labor system. The evidence before Congress documented that the emancipated slaves were not generally denied the right to enter into contractual relationships *per se,* but instead were denied the meaningful rights and benefits attendant to bona fide contractual relationships. Congress was therefore aware that the right to make and enforce contracts needed to be fully protected in order to insure the replacement of slavery with a free labor system.

We believe the rights "to make and enforce contracts" must be interpreted in reference to the abuses Congress had knowledge of and intended to address. The rights conferred in Section 1981 come "freighted with the meaning imparted to them *by the mischief to be remedied and by contemporaneous discussion.* In such conditions history is a teacher that is not to be ignored." *Duparquet Co. v. Evans,* 297 U.S. 216, 221, 56 S.Ct. 412, 414, 80 L.Ed. 591 (1936) (Cardozo, J.) (emphasis added) (citation omitted). The 1866 Act was intended to effectively respond to the abuses Congress specified. Its means were commensurate with the evils perceived. *See Historical Reconstruction,* 98 Yale L.J. at 547.

The debates themselves also demonstrate Congress' intention to accord meaningful protection to the rights enumerated in the 1866 Act. On January 5, 1986, less than one month after the ratification of the thirteenth amendment, Senator Trumbull of Illinois introduced Senate Bill 61, which eventually became the Civil Rights Act of 1866. Senator Trumbull described the need for the 1866 Act when introducing it to the Senate:

> Mr. President, I regard the bill to which the attention of the Senate is now called as the most important measure that has been under its consideration since the adoption of the constitutional amendment abolishing slavery. That amendment declared that all persons in the United States should be free. This measure is intended to give effect to that declaration and secure to all persons within the United States practical freedom. There is very little importance in the general declaration of abstract truths and principles unless they can be carried into effect, unless the persons who are to be affected by them have some means of availing themselves of their benefits.

Cong. Globe, 39th Cong., 1st Sess. 474 (1866). According to Senator Trumbull, the purpose of the 1866 Act was to "break down all discrimination between black men and white men." *Id.* at 599.

Both supporters and opponents of the 1866 Act understood the broad scope of the rights it secured.[39] According to its sponsor, Senator Trumbull, the Act would affirmatively secure those "fundamental rights belonging to every man as a free man," including the right to make and enforce contracts. *Id.* at 476. The rights specified in the 1866 Act were those thought to be essential to life, liberty, and property. *See Revolutionary Constitutionalism,* 61 N.Y.U.L.Rev. at 924–25. Indeed, much of the congressional debate centered on the broad language of the act. *See* Note, *When Is A Race Not A Race?: Contemporary Issues Under the Civil Rights Act of 1866,* 61 N.Y.U.L.Rev. 976, 982 (1986).

---

**39.** *See Jones,* 392 U.S. at 433, 88 S.Ct. at 2200 ("That the bill would indeed have so sweeping an effect was seen as its great virtue by its friends and as its greatest danger by its enemies but was disputed by none.").

Like the other rights enumerated in the 1866 Act, Congress intended to accord full protection to the rights to make and enforce contracts. Although there is no explicit discussion about whether the rights to make and enforce contracts prohibit discriminatory discharge, it is clear that Congress wanted to assure the economic independence of freedmen by protecting their rights to acquire *and* keep a job:

> [The 1866 Act] merely provides safeguards to shield [the freedmen] from wrong and outrage, and to protect them in the enjoyment of that lowest right of human nature, the right to exist. Its object is to secure to a poor, weak class of laborers the right to make contracts for their labor, the power to enforce the payment of their wages, *and the means of holding and enjoying the proceeds of their toil.* Who can deny them this?

Cong. Globe, 39th Cong., 1st Sess. 1159 (remarks of Representative Windom) (emphasis added). Moreover, Congress was not concerned with protecting the right to make contracts in the abstract; the intention was to protect the freedmen's right to enjoy the rewards of their labor free from discrimination:

> It is idle to say that a citizen shall have the right to life, *yet to deny him the right to labor,* whereby alone he can live. It is a mockery to say that a citizen may have a right to live, and yet deny him the right to make a contract *to secure the privilege and the rewards of labor.*

Cong. Globe, 39th Cong., 39th Cong., 1st Sess. 1833 (remarks of Representative Lawrence) (emphasis added). In our view, a person who is discharged because of his or her race is denied the right to labor and secure its benefits in the same way that a

person who is not hired because of race is denied this right. When Congress protected the rights to make and enforce contracts, it intended to protect the right to contract *and* the right to receive the benefits of contract.

The legislative debates are also replete with references to the fact that the 1866 Act was necessary in order to give real meaning to the thirteenth amendment. *See, e.g.,* Cong. Globe, 39th Cong., 1st Sess. 474 (1866) (remarks of Senator Trumbull) ("This measure is intended to give effect to [the thirteenth amendment] and secure to all persons within the United States practical freedom."); *id.* at 1151 (remarks of Representative Thayer) (1866 Act necessary to avoid rendering the thirteenth amendment "a mere paper guarantee"). *See also Jones,* 392 U.S. at 433, 88 S.Ct. at 2200 ("like the Senate, the House was moved by a larger objective [when passing the 1866 Act]—that of giving real content to the freedom guaranteed by the Thirteenth Amendment"). A majority in Congress believed that section two of the amendment gave it authority to enact positive legislation to remove the badges and incidents of slavery.[40] Section two of the thirteenth amendment " 'clothe[d] Congress with power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery in the United States.' " Jones,* 392 U.S. at 439, 88 S.Ct. at 2203 (emphasis in *Jones* ) (quoting *Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883)).[41] We believe that discharge based on race, like the refusal to contract, would have been viewed as another form of resistance to the creation of a true free labor system, and was one of the "badges and incidents" of slavery that Con-

---

**40.** *See, e.g.,* Globe, 39th Cong., 1st Sess. 322 (remarks of Senator Trumbull) ("I have no doubt that under [Section two] ... we may destroy all these discriminations in civil rights against the black man; and if we cannot, our constitutional amendment amounts to nothing"); *id.* at 1151 (remarks of Representative Thayer) ("when I voted for the second section of the [thirteenth amendment, I felt certain] ... that I had given to Congress ability to protect ... the rights which the first section gave ..."); *id.* at 503 (remarks of Senator Howard) (Section two of the thirteenth amendment gave Congress

the authority to enact positive legislation to combat the resistance of slaveholders to the "loss of their property").

**41.** *See also Edwards,* 855 F.2d 1345, 1347 (8th Cir.1988) (pursuant to section two of the thirteenth amendment, Congress has power to rationally determine what are the badges and incidents of slavery and to translate that determination into effective legislation) (citations omitted).

gress intended to eradicate when prohibiting discrimination in the making and enforcement of contracts.

The Senate passed the 1866 Act by a 33–12 vote on February 2, 1866, less than a month after Senator Trumbull introduced it. The House passed the measure on March 13, 1866 by a margin of 111 to 38, with 34 not voting. On March 27, 1866, President Andrew Johnson vetoed the Act. Similarly large majorities overrode the President's veto, and on April 9, 1866 the 1866 Act became law.[42] Congress debated and passed the 1866 Act with full consciousness of the unprecedented rights it conferred and the dramatic expansion of federal authority it entailed. Despite its far-reaching scope, the 1866 Act was seen as a necessary response to the crisis precipitated by the Civil War, emancipation, and post-war southern resistance. Senator Morrill expressed the sentiment of many when he remarked, "I admit that this species of legislation is absolutely revolutionary. But are we not in the midst of a revolution?" Cong. Globe, 39th Cong., 1st Sess. 570.[43]

This review of the context of the debate, the evidence before Congress, and the debates themselves is instructive in two key respects. First, the replacement of slavery with the free labor contract system was a cornerstone of northern reconstruction policy. The free contract system was seen as essential to the radical reordering of southern society. Secondly, Congress was quite conscious of the multitude of devices used to deny the freedmen the meaningful exercise of their rights, including their rights to make and enforce contracts. Congress therefore passed an intentionally broad act,

in order to insure the former slaves the meaningful exercise of their rights in the face of manifold southern resistance.

Given Congress' acquaintance with and concern about the varied forms of southern intransigence, we doubt that it would have subscribed to an interpretation of Section 1981 that secures the equal right of the freedmen to make contracts at the formation stage, but then abandons them after the contract is formed. Congress could not have been so naive as to believe that nothing more needed to be done other than to secure the right to enter into contracts. We do not believe that Congress would have countenanced an interpretation of the 1866 Act which made it susceptible to such easy subversion. This could not have been the intended fate of the 1866 Act, which was designed to secure "freedom in fact." Cong. Globe, 39th Cong., 1st Sess. 476 (remarks of Senator Trumbull). Because of the importance of the free labor contract to the envisioned transformation of the South and the evidence of resistance to its implementation that Congress considered, we believe that Congress could have only intended that the 1866 Act be interpreted to secure the *meaningful* exercise of the rights to make and enforce contracts. The historical context, evidence before Congress, and legislative history of the 1866 Act thus buttress our conclusion that the right to make contracts forbids discriminatory discharge.

For the reasons discussed above, we hold that discriminatory discharge continues to be cognizable under Section 1981, and Brown Group's argument that *Patterson* precludes actions for discriminatory discharge is rejected.[44]

**42.** The 39th Congress' override of President Johnson's veto of the Civil Rights Act of 1866 was the first time Congress had ever overridden the President on a major political issue. Many in Congress took satisfaction in the fact that the override was in favor of a statute guaranteeing equal rights for all, rather than in a dispute over an economic issue such as the imposition of a tariff. *See Jones,* 392 U.S. at 435 n. 70, 88 S.Ct. at 2201 n. 70.

**43.** *See* Cong. Globe, 39th Cong., 1st Sess. 1151–55 (remarks by Representative Thayer describing the Thirteenth Amendment as a "revolution-

ary measure" and the 1866 Act as necessary "to carry to its legitimate and just result the great humane revolution to which I have referred"). *See also Historical Reconstruction,* 98 Yale L.J. at 546–47 & n. 38.

**44.** Because we hold that discriminatory discharge is actionable under Section 1981, we need not address whether *Patterson* should be retroactively applied to Hicks's case. *Compare Hall v. County of Cook,* 719 F.Supp. 721, 725 n. 3 (N.D.Ill.1989) (*Patterson* decision retroactively applied to dismiss plaintiff's Section 1981 discharge claim) *with Gillespie v. First Interstate*

## III. Sufficiency of the Evidence

Brown Group next argues that the district court erred in denying its motion for a JNOV because the jury's finding of discrimination was clearly erroneous and not supported by sufficient evidence. We review the district court's denial of a motion for a JNOV under the well-settled standards set forth in *McGee v. South Pemiscot School District R–V:*

> Both the trial court and this Court must (a) consider the evidence in the light most favorable to the prevailing party, (b) assume that the jury resolved all conflicts of evidence in favor of that party, (c) assume as true all facts which that party's evidence tended to prove, (d) give that party the benefit of all favorable inferences which may reasonably be drawn from proved facts, and (e) deny the motion if in light of the above reasonable jurors could differ as to the conclusions that could be drawn from the evidence.

712 F.2d 339, 343 (8th Cir.1983) (*McGee*). Applying these principles to the jury's finding of intentional discrimination, we hold that the district court did not err in denying Brown Group's motion for a JNOV.[45]

Viewing the evidence in the light most favorable to Hicks, it is clear that at a minimum, the jurors could differ as to the conclusions that could be drawn from the evidence. Brown Group maintains that Hicks was terminated because Chester had more experience on the raw materials dock and was better qualified to handle the job. Rich Williams testified that he also based his decision on the fact that he believed Hicks was an emotional supervisor who would waive his hands and verbally abuse his subordinates. Williams also testified that Hicks had told him he was not happy about relocating to the Benton terminal or being forced to accept a pay cut.[46] Brown Group claims that Hicks did not contradict this explanation or show that it was pretextual. We disagree. While it is true that Hicks did not challenge Chester's general qualifications, Hicks did present evidence challenging Williams' assessment of his qualifications for the job. In the last written performance evaluation received by Hicks, the grade he received from Williams for acceptability as a company representative in plant and community was "[e]xcel-

*Bank of Wisconsin Southeast,* 717 F.Supp. 649, 651 n. 2 (E.D.Wis.1989) (*Patterson* decision not retroactively applied to reverse jury award based on Section 1981 harassment and discharge claims).

**45.** We disagree with Brown Group's contention that because this is a reverse race discrimination case, Hicks was required to prove the existence of "background circumstances support[ing] the suspicion that defendant is the unusual employer who discriminates against the majority." *Lanphear v. Prokop,* 703 F.2d 1311, 1314–15 (D.C.Cir.1983) (*Lanphear*) (citation omitted). *See also Bishopp v. District of Columbia,* 788 F.2d 781, 786 (D.C.Cir.1986) (*Bishopp*). We need not decide the impact of *Lanphear* and *Bishopp* because they both address whether or not a member of the majority race has come forward with sufficient evidence to make out a *prima facie case* of race discrimination. In this case, after hearing all of the evidence, the jury found that Brown Group discriminated against Hicks because of his race. We do not review the evidence to determine whether or not Hicks made out a prima facie case. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (after all the evidence is before the court, the factfinder must decide if the defendant intentionally discriminated against the plaintiff,

and whether the plaintiff has made out a prima facie case "is no longer relevant"); *Tolan v. Levi Strauss & Co.,* 867 F.2d 467, 469 (8th Cir.1989) (*Tolan*) (On appeal from a finding of discrimination, "this court does not review the evidence presented by the parties at any given stage of the proceedings. Instead, we must review the record to determine whether the evidence supports the jury's ultimate finding of ... discrimination."); *Estes,* 856 F.2d at 1100 (8th Cir.1988) (court rejects defendant's "case-within-a-case" contention that plaintiff must prove the sufficiency of his or her prima facie case before the sufficiency of proof regarding defendant's intent can be addressed). We need only decide whether, viewing the evidence in the light most favorable to Hicks, reasonable jurors could find that Brown Group discriminated against Hicks. *See id.; McGee v. South Pemiscot School Dist. R–V,* 712 F.2d 339, 343 (8th Cir.1983) (*McGee*). We express no opinion on the elements of a prima facie reverse race discrimination case.

**46.** As a condition for relocating to Benton, Hicks and Chester were required to accept a pay cut from $414.00 per week to $325.00 per week. After Hicks was terminated and Chester took over the night shift, he was given a $25.00 raise.

lent, exceeds job requirements, highly commendable, creative thinker." Williams conceded that he knew nothing about Hicks' and Chester's performance at the Chouteau Avenue warehouse, where they had worked for over two years before their 1982 transfers to the Benton terminal. Williams also admitted that he did not consult with any of the people who worked with Hicks and Chester at the Chouteau Avenue warehouse regarding their respective job performances. Williams further acknowledged that the operations at the Benton terminal were chaotic before Hicks arrived. Williams also observed Hicks' performance for only about a month before deciding to fire him, and completed no performance evaluation of his work while he was at the Benton terminal. Brown Group also admitted at trial that Hicks performed his duties in a competent and satisfactory manner. Hicks denied telling Williams that he was unhappy at the Benton terminal or that he wanted more money. Based on these facts, the jury could have concluded that Brown Group's explanation for discharging Hicks was pretextual.

The jury could also have found that Hicks was as well or better qualified than Chester. In addition to Hicks' greater overall experience with Brown Group, the jury may have believed that Hicks had more experience as a full-fledged supervisor because Chester's evaluation forms described his position as "assistant supervisor" as recently as September 1978. The jury could have found that Hicks was better suited to be the night shift supervisor at the Benton terminal because he had supervised the night shift on the raw materials dock at the Chouteau Avenue warehouse for two years immediately before his transfer to the Benton terminal, whereas the bulk of Chester's experience was on the day shift.[47]

Other competent evidence existed from which the jury could have inferred that race made a difference in Hicks' discharge. For example, the jury could have chosen to credit Hicks' testimony about the evasive answers and "side smirk" given by Williams when Hicks asked him whether he was terminated because he was white and Chester was black. A decisionmaker's evasiveness or inconsistency in articulating the reasons for a discharge has been found to constitute evidence of discrimination. *See Brooks v. Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1064 (8th Cir.1988); *United States v. Wolf,* 839 F.2d 1387, 1395 n. 5 (10th Cir.) ("[w]here a person hears, understands and has the opportunity to deny an accusatory statement made in his presence, the statement and his failure to deny it are admissible against him as an adoptive admission"), *cert. denied,* — U.S. —, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988). The jury also could have credited Hicks' testimony that he was told by his superiors on three separate occasions that seniority was used to decide which supervisor would receive available jobs or assignments. The jury could have found that Brown Group had a policy to make employment decisions based on seniority, and that it violated this policy by terminating Hicks despite the fact that he had more overall and supervisory seniority than Chester. Brown Group further acknowledged that it had an affirmative action policy. The jury also considered Brown Group's EEO–1 Employer Information Report, which documented a paucity of black employees in important jobs categories. Based on Brown Group's affirmative action plan and the EEO–1 report, the jury could have inferred that Chester was retained and Hicks terminated in order to increase the percentage of minorities in supervisory positions.

Our role is not to review the evidence *de novo.* We express no opinion on whether

---

**47.** Contrary to Brown Group's suggestion, we do not believe that our decision in *Holley v. Sanyo Mfg., Inc.,* 771 F.2d 1161 (8th Cir.1985) (*Holley*), requires us to reverse the jury's finding of intentional race discrimination. First, *Holley* is an age discrimination case, and it is unclear whether its principles apply to Section 1981 race discrimination claims. More importantly, "[i]n

*Holley,* the plaintiff presented absolutely no evidence from which the jury could reasonably infer discriminatory animus." *Estes,* 856 F.2d at 1101. Such is clearly not the case here. Viewing the evidence in the light most favorable to Hicks, evidence existed from which the jury could have reasonably inferred intentional race discrimination.

or not Hicks was in fact discharged because of his race. We hold only that, viewing the evidence in the light most favorable to Hicks, the jury could reasonably have inferred that he was discharged because of his race. *See Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1100 (8th Cir.1988). Because reasonable jurors could have differed as to the conclusions that could be drawn from the evidence, the district court did not err in denying Brown Group's motion for a JNOV. *See McGee*, 712 F.2d at 343.

## IV. Intentional Discrimination

Brown Group also alleges that the jury instructions and special interrogatories submitted by the district court permitted the jury to find a Section 1981 violation without proof of intentional discrimination. At trial, Brown Group objected to Instruction No. 9 on the ground that it lessened the requisite standard of proof in a Section 1981 case. Instruction No. 9 provided that "[p]laintiff is required to prove that his race or his age was either a determining factor or a discernible or motivating factor in the defendant's decision to remove plaintiff from his position." [48] Brown Group also objected to Special Interrogatory No. 7 [49] for the same reason that it objected to Instruction No. 9.

In order to establish a Section 1981 violation, intentional or purposeful discrimination must be proven. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Edwards v. Jewish Hosp.*, 855 F.2d 1345, 1351 (8th Cir.1988) (*Edwards*). Considered as a whole, the jury instructions and Special Interrogatories adequately instructed the jury that Hicks was required to prove intentional or

purposeful discrimination to establish a Section 1981 violation. The district court instructed the jury that Section 1981 made it "unlawful for an employer to discharge a person intentionally because of that person's race." Instruction No. 7. Instruction No. 8 elaborated that "[a]n act is done 'intentionally' if it is done knowingly and voluntarily and not because of mistake, accident, or other proper reason." Instruction No. 10 further provided that "an employer may lawfully terminate an employee and retain a younger employee who is of a different race, unless the employer's decision to do so is intentionally motivated by race or age." Special Interrogatories 5 and 7 also asked specifically about intentional race discrimination. "Where the instructions, considered as a whole, adequately and sufficiently state the generally applicable law, the fact that the instructions are technically imperfect or are not a model of clarity does not render the charge erroneous." *Tribble v. Washington*, 669 F.2d 1193, 1197 (8th Cir.1982) (citations omitted), *cert. denied*, 460 U.S. 1080, 103 S.Ct. 1767, 76 L.Ed.2d 342 (1983). So long as the generally applicable law is fairly stated, the district court is not required to utilize specific language or adopt any given sequence when instructing the jury. The jury instructions and Special Interrogatories in this case adequately conveyed the necessity of finding intentional discrimination for a Section 1981 violation.

## V. Punitive Damages

Brown Group next argues that the district court erred in denying its motion for a JNOV because punitive damages may not be awarded without actual or nominal damages, and the district court's award of $1.00 nominal damages by additur after the

---

**48.** Instruction No. 9 defines "determining factor" and "discernible or motivating factor" as follows:

The term "determining factor" means a factor which made a difference in determining whether or not plaintiff was to be retained or terminated.

The term "discernible or motivating factor" means a factor which was one among two or more factors that played a part in, but did not

necessarily control, the decision whether or not to retain or to terminate plaintiff.

**49.** Interrogatory No. 7 provides:

"Do you, the jury, unanimously find by a preponderance of the evidence that the defendant Brown Group, Inc., intentionally discriminated against plaintiff Kenneth Hicks on account of his race in that his race was a discernible or motivating factor in his termination from employment by defendant?"

jury awarded punitive damages violated its seventh amendment right to a jury trial. Brown Group further contends that the punitive damage award was not supported by sufficient evidence of evil motive or reckless or callous indifference to Hicks' federal civil rights.

### A. Seventh Amendment Claim

 We agree that additur is generally impermissible in federal actions because it violates the seventh amendment right to a jury trial. *See Dimick v. Schiedt*, 293 U.S. 474, 486–87, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935); *Novak v. Gramm*, 469 F.2d 430, 432 (8th Cir.1972). However, Brown Group misapprehends the significance of the jury's finding of a Section 1981 violation. Brown Group's seventh amendment right to a jury trial was satisfied when it received a jury trial on Hicks' Section 1981 claim.[50] Its seventh amendment rights were not further implicated by the district court's additur of $1.00 nominal damages, because Hicks' proof of a Section 1981 violation automatically entitled him to nominal damages.

In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (*Carey*), the Supreme Court held that the violation of certain absolute rights may entitle the plaintiff to an award of nominal damages even without proof of actual damages, and found that procedural due process was one such absolute right:

> Common-law courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages

should be awarded only to compensate actual injury or, in the case of exemplary of punitive damages, to deter or punish the malicious deprivations of rights.

> Because the right to procedural due process is "absolute" in the sense that it does not depend on the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

*Id.* at 266, 98 S.Ct. at 1054 (citations omitted). *See Hogue v. Clinton*, 791 F.2d 1318, 1323 (8th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986).

 Relying on *Carey*, we held in *Edwards* that the Section 1981 right to be free from discrimination is absolute and proof of its violation entitles the plaintiff to nominal damages. 855 F.2d at 1350. The *Edwards* court reasoned as follows:

> [I]t cannot be seriously disputed that the right to be free from intentional racial employment discrimination is absolute in the same sense [as the right to procedural due process]. This much is implicit in the one hundred and twenty-two years of American social history since the decision was made to eliminate slavery and the badges and incidents thereof.

*Id.* We reiterate here that intentional racial discrimination, regardless of against whom it is directed, has no place in American society. Section 1981 thus grants an absolute right to be free of discrimination in the making and enforcement of contracts, the violation of which entitles the victim to nominal damages irrespective of actual injury. We hold that Hicks was entitled to at least nominal damages upon showing a violation of his Section 1981 rights.

---

**50.** In *Setser v. Novak Investment Co.*, 638 F.2d 1137, 1140 (8th Cir.), *cert. denied*, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981), we held that parties in a Section 1981 action had a right to a jury trial of their legal claims. Hicks and Brown Group received the required jury trial, and the jury found that Brown Group had violated Section 1981 insofar as Hicks' race was "a determining factor" and "a discernible or motivating factor" in his termination. Special Interrogatories Nos. 5 & 7.

Because proof of a violation of Section 1981 automatically entitled Hicks to nominal damages regardless of the district court's additur of $1.00 nominal damages, we find that the district court did not err in using additur to clarify the legal consequences (e.g., presumed nominal damages) of the jury's findings of discrimination in violation of Section 1981.[51] The nominal damages to which Hicks was entitled supported the $10,000 award in punitive damages.[52] Brown Group received the jury trial required by the seventh amendment. It cannot now be heard to complain about the legal consequences of the jury's determination that it had violated Hicks' absolute right to be free from discrimination in the making and enforcement of contracts.

Citing *Mitchell v. Keith,* 752 F.2d 385, 390 (9th Cir.), *cert. denied,* 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985) (*Mitchell*), Brown Group argues that the question of whether a punitive damage award can stand absent actual or nominal damages has not been resolved by federal law, and urges us to look to Missouri law to determine whether the award can stand. According to Brown Group, Missouri law forbids the recovery of punitive damages absent a recovery of nominal damages. *See Compton v. Williams Bros. Pipeline Co.,* 499 S.W.2d 795, 797 (Mo.1973). We disagree that Missouri law applies.[53] There is no need to resort to Missouri law because federal law has addressed and resolved the issue raised by Brown Group. *See Mitchell,* 752 F.2d at 390 (appropriate to look to state law when federal law is "deficient in the provisions necessary to furnish suitable remedies"). Under *Carey* and *Edwards,* Section 1981 confers an absolute right to be free of discrimination in the making and enforcement of contracts, and the violation of this right automatically entitles the plaintiff to an award of nominal damages which can support an award of punitive damages if the standard of proof is met. *See Basista v. Weir,* 340 F.2d 74, 87 (3d Cir.1965) ("[a]s a matter of federal common law it is not necessary to allege nominal damages and nominal damages are

---

**51.** This court has directed the judicial entry of nominal damages when an award of actual damages cannot be sustained. *Jasperson v. Purolator Courier Corp.,* 765 F.2d 736, 742 (8th Cir.1985); *Dean v. Civiletti,* 670 F.2d 99, 101 (8th Cir.1982) ("having prevailed on the discrimination issue ... [plaintiff] is entitled to recover nominal damages of at least $1.00 as well as reasonable attorney's fees for proceedings in the district court"). *See Stepter v. Underhill,* 687 F.Supp. 1186, 1187 (S.D.Ohio 1988) ($1.00 nominal damages entered by court upon jury finding of race discrimination); *Wright v. Jasper's Italian Restaurant, Inc.,* 672 F.Supp. 424, 426 (W.D. Mo.1987) ("[U]nder appropriate circumstances, judges can independently direct the entry of nominal damage judgments. A legal implication of damages arises whenever a legal right of plaintiff is violated.") (citation omitted).

**52.** Brown Group does not dispute that nominal damages can support a punitive damage award where the standard of proof for imposition of punitive damages is met. *See Goodwin v. Circuit Court,* 729 F.2d 541, 542–43 (8th Cir.) (nominal damages support punitive damages award), *cert. denied,* 469 U.S. 828, 105 S.Ct. 112, 83 L.Ed.2d 55 (1984); *Edwards,* 855 F.2d at 1352 (nominal damages supports $25,000 punitive damage award). Nor is there a requirement that the punitive damage award bear a reasonable relationship to the nominal damages. "To apply the proportionality rule to a nominal damages award would invalidate most punitive damages awards because only very low punitive

damages awards could be said to bear a reasonable relationship to the amount of a nominal damages award." *Edwards,* 855 F.2d at 1352.

**53.** Even assuming that Missouri law applies, we are not convinced that Hicks would be stripped of his punitive damages award under Missouri law. Applying the law of Missouri in *Wright v. Jasper's Italian Restaurant, Inc.,* 672 F.Supp. at 426 (citation omitted), the United States District Court for the Western District of Missouri noted a distinction between "direct injury" torts and those torts where "pecuniary loss constitutes a part of the cause of action." The court found that the torts at issue, assault and false imprisonment, were direct injury torts like trespass, where the wrong is committed regardless of pecuniary loss. *Id.* Reasoning that a legal implication of damages arises whenever a legal right of plaintiff is violated, the court upheld punitive damage awards totaling $55,000 despite the fact that the jury did not award actual damages. *Id.* Section 1981 is an absolute prohibition of discrimination in the making and enforcement of contracts. It is not necessary to prove actual damages to establish a Section 1981 violation. *Edwards,* 855 F.2d at 1352. Consequently, we believe that Missouri courts would view Section 1981 as a direct injury tort which, upon proof of its violation, raises a legal implication of nominal damages sufficient to support a punitive damages award.

proved by proof of deprivation of a right to which the plaintiff is entitled"). Applying federal law to determine Hicks' entitlement to the Section 1981 punitive damage award also satisfies the requirement that damages issues be determined in accordance with a federal standard which furthers the purpose of the civil rights statutes. *Sullivan*, 396 U.S. at 238–40, 90 S.Ct. at 405–06 (1969); *see Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir.1986) (court refuses to reverse punitive damages award in 42 U.S.C. § 1983 action even though such damages are not recoverable under state law). For these reasons, we find that federal law applies, Hicks automatically became entitled to nominal damages upon proving a Section 1981 violation, and the district court did not violate Brown Group's seventh amendment right to a jury trial by its additur of $1.00 in nominal damages.

## B. Sufficiency of the Evidence

■ Hicks also contends that the district court erred in denying its motion for a JNOV because the jury's award of punitive damages was not supported by sufficient evidence. In *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983) (*Smith* ), the United States Supreme Court held that "a jury may be permitted to assess punitive damages in an action under [42 U.S.C.] § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." This court applied the *Smith* punitive damages test to Section 1981 actions in *Block v. R.H. Macy & Co.*, 712 F.2d 1241, 1246 (8th Cir. 1983) (*Block* ).

We first note that the jury was instructed properly that it could award punitive damages if it found that Hicks' firing was "motivated by evil motive or interest, or that defendant was callously indifferent to plaintiff's federally protected rights." Instruction No. 13. Viewing the evidence, as we must, in the light most favorable to Hicks, we hold that there was sufficient evidence for the jury to conclude that Hicks was entitled to punitive damages. *See Tolan*, 867 F.2d at 469. The district court properly denied Brown Group's motion for a JNOV on the punitive damages award because reasonable jurors could have differed as to whether Brown Group was reckless or callously indifferent to Hicks' federal rights. *See McGee*, 712 F.2d at 343.

For example, the jury could have found that Brown Group acted recklessly or with callous indifference to Hicks' federally protected rights by discharging him after 34 years of service because of his race, and giving his job to a junior employee despite a company policy to make employment decision based on seniority. *See Block*, 712 F.2d at 1247–48 (finding of purposeful race discrimination under Section 1981 may in and of itself justify award of punitive damages). Moreover, after Hicks was discharged, he twice asked Rich Williams, his immediate supervisor and the person who made the decision to discharge him, whether he was terminated because of his race. The jury could have found that the evasive, teasing responses of Rich Williams to Hicks' earnest inquiries constituted callous or reckless indifference to Hicks' federally protected rights. Based on these facts, and after observing the demeanor and credibility of the witnesses, the jury could have concluded that Brown Group was callously indifferent to Hicks' federally protected rights. Whether or not punitive damages should be awarded is a jury determination that is rarely disturbed. *See Garza v. City of Omaha*, 814 F.2d 553, 556 (8th Cir.1987). As stated by this court in *Goodwin v. Circuit Court*, "[j]uries are uniquely suited to make this kind of moral judgment." 729 F.2d 541, 548 (8th Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 112, 83 L.Ed.2d 55 (1984). Because of the proper jury instruction, the finding of intentional discrimination, and Williams' evasive responses, we decline Brown Group's invitation to substitute our moral judgment for that of the jury.

## VI. Cross–Appeal: Equitable Relief

Having found none of the issues raised by Brown Group to merit reversal, we turn now to Hicks' cross-appeal. Hicks argues

that the district court erred in denying his post-trial motion for reinstatement and related equitable relief despite the fact that he had successfully proven that he would not have been discharged except for his race. Hicks argues that the district court erred in allowing the jury to answer Special Interrogatories Nos. 7 and 10 after the jury found in Special Interrogatory No. 5 that race was a "determining factor in his termination from employment."

■ The three Special Interrogatories in dispute provided as follows:

Special Interrogatory No. 5.

Do you, the jury, unanimously find by a preponderance of the evidence that the defendant Brown Group, Inc., intentionally discriminated against plaintiff Kenneth Hicks on account of his race in that his race was a determining factor in his termination from employment by defendant?

Answer: Yes.

Special Interrogatory No. 7.

Do you, the jury unanimously find by a preponderance of the evidence that the defendant Brown Group, Inc., intentionally discriminated against plaintiff Kenneth Hicks on account of his race in that his race was a discernible or motivating factor in his termination from employment by defendant?

Answer: Yes.

Special Interrogatory No. 10.

Do you, the jury, unanimously find by a preponderance of the evidence the defendant Brown Group, Inc., would have terminated plaintiff Kenneth Hicks from employment, even had plaintiff's race and age not been a discernible or motivating factor or a determining factor in the decision to terminate?

Answer: Yes.

Hicks argues that Special Interrogatories numbers 5 and 10 ask the same question, namely whether Hicks' race was the "but for" cause of his termination. Hicks argues that Special Interrogatory No. 10 should be disregarded as surplusage, and requests this court to grant him reinstatement and related equitable relief. In the alternative, Hicks requests a partial new trial in order for the jury to determine, given that race played a role in his discharge, whether it made a difference in determining the outcome of that decision.

Brown Group does not respond to the apparent conflict between Special Interrogatories Nos. 5 and 10, but instead argues that *Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) (*Price Waterhouse*), requires that judgment be entered in its favor because the jury's answer to Special Interrogatory No. 10 established that Hicks would have been discharged even if his race was not taken into account. *Price Waterhouse* is a mixed-motive Title VII case decided by the Supreme Court while this appeal and cross-appeal were pending. In *Price Waterhouse,* the plurality held that once a plaintiff proves that a prohibited factor "played a motivating part in an employment decision, the defendant may avoid a finding of *liability* only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [impermissible factor] into account." *Id.* 109 S.Ct. at 1795 (emphasis added). Brown Group argues that *Price Waterhouse* implicitly overruled *Bibbs v. Block,* 778 F.2d 1318, 1324 (8th Cir.1985) (en banc), which held that an employer who shows that it would have made the same decision may avoid promotion or reinstatement, but not liability under Title VII. Brown Group further argues, without discussing the different purposes and legislative histories of Title VII and Section 1981, that *Price Waterhouse* also undermines this court's Section 1981 decisions and the Special Interrogatories in this case.

While the Special Interrogatories in this case were indeed confusing, we need not address whether they constitute reversible error. Hicks' counsel failed to object to Special Interrogatory No. 10 at trial despite having the opportunity to do so. Consequently, the issue was not preserved for appellate review. *United States v. Carey,* 898 F.2d 642 at 644 (8th Cir.1990); *United States v. Elem,* 845 F.2d 170, 173 (8th Cir.1988); *Patterson v. United States,* 361 F.2d 632, 636 (8th Cir.1966). We need not

address the merits of Hicks' cross-appeal and Brown Group's response, and leave for another day the determination of the precise effect (if any) that *Price Waterhouse* has on this court's Section 1981 and Title VII precedent.

## CONCLUSION

To summarize, we hold that (1) racially discriminatory discharge continues to be actionable under Section 1981 after *Patterson*; (2) the district court did not err in denying Brown Group's motion for a JNOV because the jury's finding of race discrimination was supported by sufficient evidence; (3) the jury instructions and Special Interrogatories adequately instructed the jury on the need to prove intentional discrimination to establish a Section 1981 violation; (4) the district court did not violate Brown Group's seventh amendment right to a jury trial by its additur of $1.00 in nominal damages, and the punitive damages award was supported by sufficient evidence; and (5) the court need not reach the merits of Hicks' cross-appeal or Brown Group's response because Hicks failed to properly preserve this issue for appellate review. Accordingly, the judgment of the district court is

AFFIRMED.

FAGG, Circuit Judge, dissenting.

I respectfully dissent. In my opinion this case is controlled by the Supreme Court's decision in *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

In *Patterson*, the Supreme Court considered the meaning and coverage of 42 U.S.C. § 1981. In doing so, the Supreme Court declared that "[w]here an alleged act of discrimination does not [impair the making and enforcement of contracts], [section] 1981 provides no relief." *Id.* at 2372. This construction of section 1981 is binding on the courts of appeals. *In re Continental Inv. Corp.*, 586 F.2d 241, 248 (1st Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979); *United States v. Herrera*, 584 F.2d 1137, 1145 (2d Cir.1978); *United States v. LeFaivre*, 507 F.2d 1288, 1294 (4th Cir.1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975).

Because the *Patterson* majority did not expressly limit its construction of the language of section 1981 to the factual circumstances before the Court, "it is the principle [that] controls and not the specific facts [on] which the principle was decided." *Walker v. Georgia*, 417 F.2d 5, 8 (5th Cir. 1969). Nevertheless, our court lamely declines to apply *Patterson* because "[discriminatory] discharge was not at issue or discussed [in *Patterson*], and nothing in [*Patterson*] requires us to overrule the numerous and long-settled cases in this circuit which hold that discriminatory discharge is actionable under [s]ection 1981." Ante at 635. I believe our court has mistakenly concluded that *Patterson* is not a controlling precedent in this case.

Although *Patterson* is factually distinguishable, the Supreme Court's decision is legally relevant because it is a decision in the identical area of the law. *Levine v. Heffernan*, 864 F.2d 457, 460 & n. 8 (7th Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 204, 107 L.Ed.2d 157 (1989). When a court of appeals is faced with "a factually distinguishable but legally relevant Supreme Court decision, ... [the court] may not employ a different standard in analyzing the different facts [because to do so] would [ ] limit[ ] both the Supreme Court's decision and its method of analysis to a particular set of facts." *Id.* at 460.

Patterson's and Hicks's claims of racial discrimination in their employment were clearly triggered by different facts—racial harassment for Patterson and racial discriminatory discharge for Hicks. Despite these factual differences, the Supreme Court's construction of section 1981 in *Patterson* controls the outcome of Hicks's case because both Patterson and Hicks brought their claims of racial discrimination in the workplace under the identical statute. Our court is "obliged [ ] rigorously [to] apply the prevailing, majority precedent" in *Patterson*. *Ferina v. United States*, 340 F.2d 837, 839 (8th Cir.), *cert. denied*, 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965); *see also Rodriguez De Quijas v. Shear-*

*son/American Express*, — U.S. ——, 109 S.Ct. 1917, 1922–23, 104 L.Ed.2d 526 (1989) (Stevens, J., dissenting) (court of appeals refusal to follow a controlling Supreme Court precedent is "an indefensible brand of judicial activism").

Because section 1981 "prohibits discrimination only in the making and enforcement of contracts," *Patterson*, 109 S.Ct. at 2372, Hicks's claim must fail. Hicks's claim of discriminatory discharge "involves [n]either a refusal to make a contract with [him] or the impairment of [his] ability to enforce [his] established contract rights. Rather, the conduct which [Hicks] labels as actionable racial [discriminatory discharge] is postformation conduct by the employer relating to the terms and conditions of continuing employment.... This type of conduct ... is not actionable under [section] 1981...." *Id.* at 2374.

The decision in *Patterson* is controlling in this case and binding on our court. Thus, I would reverse the district court.